George JANSSEN, et al., Respondents,

v.

BEST & FLANAGAN, et
al., Defendants,

and

Minneapolis Police Relief Association,
Petitioner, Appellant.

No. CX–01–2207.

Supreme Court of Minnesota.

May 22, 2003.

Patrick J. McLaughlin, Eric Moutz, Dorsey & Whitney, LLP, Minneapolis, for appellant.

William J. Mavity, Pamela Marie Miller, Mavity & Associates, Minneapolis, for respondents.

Martin J. Costello, Hughes & Costello, St. Paul, for Amicus Curiae, Minnesota Teamsters Joint Council 32, et al.

## OPINION

MEYER, Justice.

We are called on to decide certain questions of first impression regarding the law of nonprofit corporations in Minnesota. The principal issue concerns how a nonprofit board may respond to a member's demand to commence legal action on behalf of the association. We also consider the degree of deference that a district court may give to a nonprofit board's decision to reject a member's demand to commence legal action.

The board of directors of the Minneapolis Police Relief Association (MPRA) made an improvident investment in a company known as Technimar and lost approximately fifteen million dollars. Certain members of MPRA (Janssen, et al., whom we will refer to collectively as "Janssen") brought a derivative suit on behalf of MPRA against Best & Flanagan alleging attorney malpractice with respect to the Technimar investment. MPRA appointed special counsel to review the merits of the derivative suit. Special counsel concluded that proceeding with the derivative suit would not be in the best interests of MPRA and MPRA moved to dismiss the suit. The district court treated special counsel as a special litigation committee, applied the business judgment rule to the committee's decision not to proceed with the derivative action, and dismissed Janssen's suit. The court of appeals reversed, concluding that the legislature had not granted nonprofit corporations authority to appoint special litigation committees, and the district court was precluded from deferring to the decision of MPRA's special counsel. MPRA petitioned for review, seeking a reversal of the court of appeals' decision.

MPRA is a Minnesota nonprofit corporation that administers a pension plan for Minneapolis police officers hired before June 15, 1980. Minn.Stat. § 423B.01–.04 (2002). MPRA was formed under and is subject to Minn.Stat. ch. 317A (2002), the Minnesota Nonprofit Corporation Act, and is governed by a board of nine directors. See Minn.Stat. § 423B.05, subd. 1 (2002).

In 1996 and 1997, MPRA lost approximately fifteen million dollars that it had invested with David Welliver in a company called Technimar. The circumstances surrounding this loss were the subject of several investigations and at least two prior lawsuits. The most important aspect of this history for the instant case is that two law firms, Jones, Day, Reavis and Pogue (Jones Day) and Dorsey & Whitney, LLP (Dorsey Whitney), had already conducted investigations surrounding some of the issues.

Janssen alleges in this action that MPRA's former attorneys, Best & Flanagan, committed malpractice in representing MPRA during and after the Welliver investments were made in 1996 and 1997. Janssen alleges, among other claims, that Best & Flanagan attorneys served as general counsel to MPRA and were negligent

in failing to conduct a "due diligence" inquiry into the Welliver investment. In bringing this derivative suit, Janssen did not have an attorney-client relationship with Best & Flanagan, so their suit depended upon MPRA joining them as a plaintiff.

In response to this lawsuit, MPRA appointed attorney Robert A. Murnane (Murnane) as special counsel to investigate Janssen's claims and determine whether MPRA should join the derivative suit. The MPRA board issued a resolution in June of 2000 instructing Murnane to conduct an independent review and evaluate the derivative lawsuit to determine on behalf of MPRA's board of directors whether or not MPRA should join in legal action against Best & Flanagan. The resolution specifically instructed Murnane to "not reinvestigate, verify or otherwise attempt to prove or disprove the factual findings, determinations, events or circumstances" described in the prior investigative reports of Jones Day and Dorsey Whitney and a set of discovery materials in a related lawsuit. Murnane was specifically instructed to "accept as correct" the factual findings of these reports and discovery materials. Murnane was not limited, however, by the conclusions of the previous reports.

Murnane reviewed "thousands of pages of reports, documents and deposition transcripts" over a few months in investigating the merits of a malpractice action against Best & Flanagan. However, the record does not indicate that he conducted any of his own investigation, nor did he personally speak to the Janssen claimants or their counsel. Murnane submitted his report to the MPRA board on September 26, 2000, concluding that "the totality of the materials reviewed does not support a finding that Best & Flanagan committed legal malpractice in its handling of the MPRA affairs," and that "to spend money in the pursuit of a legal malpractice claim against Best & Flanagan would not be prudent use of the MPRA funds." Following submission of Murnane's report, the MPRA board brought a motion to dismiss the instant lawsuit under the principle of law that the court should defer to the business judgment of Murnane, MPRA's special litigation committee.

In considering MPRA's motion to dismiss, the district court described the appropriate role that special litigation committees play in acting on behalf of for-profit corporations. The court determined that a nonprofit corporation is also authorized to utilize the special litigation committee procedure. The court treated Murnane as a special litigation committee and applied the business judgment rule to the committee's report. Under the business judgment rule enunciated by the court, it examined only whether the committee conducted its investigation with independence and good faith. The court concluded that "[Murnane's] investigation cannot survive even this limited review." The court could not find that Murnane was independent because "he was told by the board of directors what to believe." The court could not find good faith because there was no indication from Murnane that he sought or received input from the plaintiffs and the court was left to assume that such input was not sought because the board's instructions limited the scope of the investigation. Finally, the court could not clearly discern whether Murnane was offering legal advice or, in fact, rendering a business judgment decision.

Rather than deny MPRA's motion to dismiss the Janssen lawsuit, the district court postponed a decision on the motion

to allow MPRA an opportunity to remedy the deficiencies in MPRA's delegation of authority to its special litigation committee. The court instructed MPRA that if it sought deference for its committee's litigation decision, the court would not grant such deference unless and "until adequate evidence of independence and good faith is submitted by the MPRA, and until it is clear that Murnane has rendered a business judgment."

Consequently, MPRA issued a second resolution in December of 2000 to Murnane, declaring that he was to function as a special litigation committee, not being limited in any way as to how to conduct his investigation or what material he may consider: "[s]pecial counsel shall have complete independence and may undertake whatever good faith investigation he chooses." The resolution asked Murnane to exercise his "business judgment" regarding whether it was in the best interest of MPRA to join in the derivative suit. Murnane conducted an investigation that included meeting with certain of the named plaintiffs in the action and the involved attorneys at Best & Flanagan. Murnane submitted a second report and in that report concluded it would be a "poor business judgment" for MPRA to join in litigation against Best & Flanagan. MPRA renewed its motion to dismiss. The district court reviewed Murnane's second report and concluded that MPRA's special litigation committee (Murnane) had conducted an investigation that was independent and conducted in good faith. The court deferred to the committee's business judgment and granted MPRA's motion to dismiss the complaint against Best & Flanagan.

Janssen appealed and the court of appeals reversed. It concluded that a nonprofit corporation lacks the statutory authority to appoint a special litigation committee to evaluate derivative claims. Additionally, the court concluded that even if a nonprofit corporation has the authority to appoint a special litigation committee, in this case the special litigation committee failed to meet the threshold test of the business judgment rule. The court reversed and remanded for trial. This appeal followed.

I.

■ ⁎ We concern ourselves with two questions: (1) whether the Minnesota Nonprofit Corporations Act prohibits a nonprofit corporation's board of directors from establishing an independent committee with authority to make decisions about derivative lawsuits; and (2) whether Murnane, as special counsel, displayed sufficient independence and good faith to be entitled to the deference of the business judgment rule. We exercise de novo review of the primary issues in this case, as they involve statutory interpretation and novel questions of law. *State v. Loge,* 608 N.W.2d 152, 155 (Minn.2000). We also note that other states have recently held that they will review de novo a decision of a district court to dismiss a derivative suit. *See Brehm v. Eisner,* 746 A.2d 244, 253 (Del.2000); *In re PSE & G S'holder Litig.,* 173 N.J. 258, 801 A.2d 295, 313 (2002).

A. The Business Judgment Rule and Derivative Lawsuits

To resolve this case we must strike a balance between two competing interests in the judicial review of corporate decisions. *See PSE & G,* 801 A.2d at 306. On one hand, courts recognize the authority of corporate directors and want corporations to control their own destiny. *Stoner v.*

*Walsh,* 772 F.Supp. 790, 796 (S.D.N.Y. 1991). On the other hand, courts provide a critical mechanism to hold directors accountable for their decisions by allowing shareholder derivative suits. *See Barrett v. Southern Conn. Gas Co.,* 172 Conn. 362, 374 A.2d 1051, 1055 (1977) (remarking that " '[i]f the duties of care and loyalty which directors owe to their corporations could be enforced only in suits by the corporation, many wrongs done by directors would never be remedied' " (citation omitted)); *Brown v. Tenney,* 125 Ill.2d 348, 126 Ill. Dec. 545, 532 N.E.2d 230, 232 (1988) (stating that "[t]he derivative suit is a device to protect shareholders against abuses by the corporation, its officers and directors, and is a vehicle to ensure corporate accountability"). Because shareholder-derivative litigation is not an everyday occurrence in Minnesota's courts, we address these issues for the first time.

Courts have attempted to balance these two competing concerns by establishing a "business judgment rule" that grants a degree of deference to the decisions of corporate directors. The business judgment rule was developed by state and federal courts to protect boards of directors against shareholder claims that the board made unprofitable business decisions. "The business judgment rule is a presumption protecting conduct by directors that can be attributed to any rational business purpose." Dennis J. Block, et al., *The Business Judgment Rule: Fiduciary Duties of Corporate Directors* 18

(5th ed.1998). The business judgment rule means that as long as the disinterested director(s) made an informed business decision, in good faith, without an abuse of discretion, he or she will not be liable for corporate losses resulting from his or her decision. *Id.* at 39. Two major reasons buttress the decision to grant a degree of deference to corporate boards. First, protecting directors' reasonable risks is considered positive for the economy overall, as those risks allow businesses to attract risk-averse managers, adapt to changing markets, and capitalize on emerging trends.[1] Second, courts are ill-equipped to judge the wisdom of business ventures and have been reticent to replace a well-meaning decision by a corporate board with their own. *See, e.g., Auerbach v. Bennett,* 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994, 1000 (1979).

Where the shareholders of a corporation believe the board has acted improperly, corporate law recognizes the shareholders' ability to bring a derivative lawsuit. Derivative suits allow shareholders to bring suit against wrongdoers on behalf of the corporation, and force liable parties to compensate the corporation for injuries so caused. *Tenney,* 126 Ill.Dec. 545, 532 N.E.2d at 233. A derivative action actually belongs to the corporation, but the shareholders are permitted to bring the action where the corporation has failed to take action for itself. *See id.* Because of the business judgment rule, however, not all shareholders' derivative

---

**1.** For a thorough discussion of the rationale behind judicial deference to business decisions, *see* Peter V. Letsou, *Implications of Shareholder Diversification on Corporate Law and Organization: The Case of the Business Judgment Rule,* 77 Chi.-Kent L.Rev. 179, 181–82 (2001); Eric W. Orts, *The Complexity and Legitimacy of Corporate Law,* 50 Wash. & Lee L.Rev. 1565, 1588 (1993); Ralph K. Winter, *On 'Protecting the Ordinary Investor,'* 63 Wash. L.Rev. 881, 895 (1988); Daniel R. Fischel & Michael Bradley, *The Role of Liability Rules and the Derivative Suit in Corporate Law: A Theoretical and Empirical Analysis,* 71 Cornell L.Rev. 261, 270–71 (1986).

suits proceed on their merits. While derivative suits may benefit a corporation, any benefit must be weighed against the possibility that disgruntled shareholders will bring nuisance lawsuits with little merit and that even legitimate suits may not be worth pursuing when the likelihood of victory is compared with the time, money, and hostility necessary to win. The substantive decision about whether to pursue the claims advanced in a shareholder's derivative action involves "the weighing and balancing of legal, ethical, commercial, promotional, public relations, fiscal and other factors familiar to the resolution of many if not most corporate problems." *Auerbach,* 419 N.Y.S.2d 920, 393 N.E.2d at 1002. The careful balancing of those factors is best done by the board of directors, which is familiar with the appropriate weight to attribute to each factor given the company's product and history. Thus, courts apply the business judgment rule when evaluating the decision by a board of directors whether to join or quash a derivative suit belonging to the corporation. *Block, supra,* at 1702–03.

Having established the principles by which we apply the business judgment rule to a for-profit corporate board's decision whether to join a derivative lawsuit, we consider whether to grant similar deference to nonprofit boards of directors. The parties in this case have presumed the business judgment rule will apply to MPRA. Other states have applied the business judgment rule to decisions of nonprof-

it corporations, explicitly or implicitly. The highest courts of Alabama, Hawaii, and South Dakota have done so, as have intermediate appellate courts of Colorado, New York, Ohio, South Carolina, Tennessee, and Wisconsin.[2] We find no case denying a nonprofit organization the protection of the business judgment rule.

■ In addition to finding support in other jurisdictions for giving judicial deference to nonprofit corporate decisions, the primary rationales for applying the business judgment rule in the for-profit context apply in the nonprofit context as well. Organizations are autonomous agents that should control their own destiny. *See Auerbach,* 419 N.Y.S.2d 920, 393 N.E.2d at 1000–01. Directors of nonprofits may take fewer risks than would be optimal if they were overly concerned about liability for well-meaning decisions. *See* Daniel R. Fischel & Michael Bradley, *The Role of Liability Rules and the Derivative Suit in Corporate Law: A Theoretical and Empirical Analysis,* 71 Cornell L.Rev. 261, 270 (1986). Additionally, courts are not well-equipped to scrutinize the decisions of a corporation; judges should not be caught in the middle of fighting factions of nonprofits any more than they should be thrust between dissatisfied shareholders and profit-seeking boards. *See id.* at 273. Therefore, we conclude that the boards of nonprofit corporations may receive the protection of the business judgment rule.

### B. Special Litigation Committees

We turn now to consider whether a nonprofit board of directors that is not suffi-

---

2. *See Fairhope Single Tax Corp. v. Rezner,* 527 So.2d 1232, 1236 (Ala.1987); *Chun v. Bd. of Trustees of the Employees' Ret. Sys. of the State of Hawaii,* 87 Hawai'i 152, 952 P.2d 1215, 1226–27 (1998); *Mahan v. Avera St. Luke's,* 621 N.W.2d 150, 154 (S.D.2001); *Rywalt v. Writer Corp.,* 34 Colo.App. 334, 526 P.2d 316, 317 (1974); *Scheuer Family Foundation Inc. v. 61 Associates,* 179 A.D.2d 65,

582 N.Y.S.2d 662, 663 (1992); *Solomon v. Edgewater Yacht Club, Inc.,* 35 Ohio Misc.2d 1, 519 N.E.2d 429, 431 (Mun.1987); *Dockside Ass'n, Inc. v. Detyens,* 291 S.C. 214, 352 S.E.2d 714, 716 (App.1987); *Burke v. Tennessee Walking Horse Breeders' & Exhibitors' Ass'n,* 1997 WL 277999, *9 (Tenn.Ct.App. 1997); *John v. John,* 153 Wis.2d 343, 450 N.W.2d 795, 801–02 (Wis.Ct.App.1989).

ciently independent to decide whether to join a member's derivative lawsuit may establish a special litigation committee with authority to make the decision.[3] Janssen claims a nonprofit may not appoint a special litigation committee because the Minnesota Nonprofit Corporation Act (Nonprofit Act) provides no such authority. Minn.Stat. § 317A.241 (2002). MPRA argues that the Nonprofit Act permitted them to appoint Murnane as its special litigation committee, and the district court agreed. The court of appeals concluded that the statute prohibited nonprofits from appointing special litigation committees. We agree with the district court.

 Special litigation committees are made up of disinterested board members or individuals appointed by the board who are charged with informing themselves fully on the issues underlying the derivative suit and deciding whether pursuit of litigation is in the best interests of the corporation. *See, e.g., Houle v. Low,* 407 Mass. 810, 556 N.E.2d 51, 53 (1990); *Drilling v. Berman,* 589 N.W.2d 503, 505–07 (Minn.App.1999); *PSE & G,* 801 A.2d at 303. The key element is that the board delegates to a committee of disinterested persons the board's power to control the litigation. Block, *supra,* at 1689. A mere advisory role of the special litigation committee fails to bestow a sufficient legitimacy to warrant deference to the committee's decision by the court. If the board properly delegates its authority to act to the special litigation committee, the court will extend deference to the committee's decision under the business judgment rule.

*See Drilling,* 589 N.W.2d at 510; *Skoglund v. Brady,* 541 N.W.2d 17, 22 (Minn.App. 1995); *Black v. NuAire, Inc.,* 426 N.W.2d 203, 211 (Minn.App.1988).

## C. Minnesota Nonprofit Corporations Act

We look to the Nonprofit Act to determine whether MPRA had statutory authority to appoint its special litigation committee. The relevant part of the statute reads:

A resolution approved by the affirmative vote of a majority of the board may establish committees having the authority of the board in the management of the business of the corporation to the extent provided in the resolution. Committees are subject at all times to the direction and control of the board.

Minn.Stat. § 317A.241, subd. 1 (2002).

The first inquiry in statutory interpretation is whether the law is ambiguous. *See* Minn.Stat. § 645.16 (2002). If the words are clear and unambiguous, "the letter of the law shall not be disregarded under the pretext of pursuing the spirit." *Id.* MPRA argues the statute unambiguously allows nonprofit boards to create independent committees. It maintains that the statute does not limit the types of committees that nonprofits can create in any way, thereby making litigation committees acceptable. In addition, MPRA posits that the phrase "subject at all times to the direction and control of the board" does not strip the committees of the independence necessary for the protection of the business judgment rule. Instead, it argues that "sub-

---

**3.** Both Janssen and MPRA accepted the premise that the full MPRA board was not independent enough to merit judicial deference as a decision maker, and made no arguments about deferring to the decision of the board of directors to accept Murnane's report. Thus, we are focusing on whether Murnane's decision is entitled to deference.

ject * * * to" simply indicates a "possibility of control," not a necessity of constant control.

Janssen also argues that the statute is unambiguous but urges a contrary meaning: a committee that must be "subject to" the "control" of the board cannot be sufficiently independent from the board to deserve the protection of the business judgment rule. Janssen also points to subdivision 5 of the statute, noting that a director cannot fulfill his or her standard of conduct by delegating authority to the board, as an indication that nonprofit directors have to retain control over all board committees.

The language in subdivision 1 indicating that committees must be subject to the board's control and direction could reasonably be interpreted to mean either that the board must control every move of the committees, or simply that the board has a duty to oversee the work of the committees. The former interpretation would make true independence impossible, while the latter interpretation is flexible enough to allow for independent committees. As both parties' interpretations are plausible, we conclude the statute is not clear and free from all ambiguity.

If the words of a statute are not explicit, we interpret the statute's meaning by considering the intent of the legislature in drafting the law. Minn.Stat. § 645.16 (2002). There are three overarching considerations we consider in discerning legislative intent in this case: the context of the 1989 revision of the Nonprofit Act, contemporaneous legislative history, and consequences of a particular interpretation. *Id.* We will address each of these in turn. In addition, we presume that the legislature did not intend an absurd result or to violate the Constitution, and that it intended

the entire statute to have effect and favor the public interest. Minn.Stat. § 645.17 (2002).

The 1989 revision of the Nonprofit Act was carried out eight years after the legislature enacted a wholesale revision of the Minnesota Business Corporation Act (Business Act), Minn.Stat. ch. 302A (2002), in 1981. *See* Minnesota Business Corporation Act of 1981, ch. 270, §§ 1–125, 1981 Minn. Laws 1141–1222. Shortly after the revised Business Act was adopted, the Minnesota State Bar Association organized a group to study the counterpart statute for nonprofits, and found it was outdated and unworkable, with many ambiguities. Hearing on H.F. 1203, H. Subcomm. Civil Law, 76th Minn. Leg., April 24, 1989 (audio tape) (comments of Kathleen Pontius). The act had not been revised since 1951, when the archetypal nonprofit in legislators' minds was a social club like the Jaycees or Rotary. Hearing on H.F. 1203, H. Subcomm. Civil Law, 76th Minn. Leg., April 24, 1989 (audio tape) (comments of Patrick Plunkett, president of Ramsey County Bar Ass'n). This original conception made the statute a poor fit for the growing number and variety of nonprofit organizations, and for the lawyers who served them. *Id.* A legislative committee drafted a new statute governing nonprofits, with three major sources: the Business Act, the ABA's Revised Model Nonprofit Act, and Minnesota's old nonprofit act. Hearing on H.F. 1203, H. Subcomm. Civil Law, 76th Minn. Leg., April 24, 1989 (audio tape) (comments of Rep. Thomas Pugh, bill's sponsor).

Minnesota Statutes § 317.241 was passed in the context of a wholesale revision of the Nonprofit Act. The legislature did not pass the statute to specifically address the committee structure of nonprof-

its or their ability to control derivative suits. We conclude that the legislature's purpose in revising the Minnesota Nonprofit Corporations Act in 1989 had nothing to do with special litigation committees, and sheds little light on our inquiry.

We next examine the contemporaneous legislative history to determine legislative intent. In reaching its decision that the legislature did not intend to empower nonprofit boards to create special litigation committees, the court of appeals emphasized the difference between the Business Act and the Nonprofit Act on this subject. The Business Act specifically says a board of directors may establish special litigation committees of one or more directors "to consider legal rights or remedies of the corporation and whether those rights and remedies should be pursued. Committees *other than special litigation committees* * * * are subject at all times to the direction and control of the board." Minn. Stat. § 302A.241, subd. 1 (2002) (emphasis added). The court of appeals was concerned that not only does the Nonprofit Act lack a specific provision for special litigation committees, it also does not exempt any committees from board control.

The comparison between the Business Act and the Nonprofit Act does not illuminate as much legislative intent as the court of appeals derived, however. The Nonprofit Act was passed eight years after the Business Act, making any attempt to infer meaning from a comparison between the two less convincing. A careful review of the available legislative history produced no discernible indication why the special litigation committee language was dropped. The absence of the special litigation language in the nonprofit statute could mean several things, including that the drafters did not think derivative suits were an issue for nonprofits and therefore did not address litigation committees in the Nonprofit Act.

■ Given that little legislative intent concerning section 317A.241 can be inferred from either the purpose of the 1989 revision of the Nonprofit Act or the comparison with the Business Act, we are left with one remaining consideration in discerning legislative intent under Minn.Stat. § 645.16: the consequences of a particular interpretation. On this point it becomes clear that the district court reached the correct result. The district court noted that if nonprofit corporate boards are unable to establish independent committees whose informed business judgments merit deference from the courts, the judiciary would be forced to review the merits of every lawsuit brought by a member of a nonprofit corporation. Reviewing all derivative suits for nonprofit corporations would intrude on the authority of nonprofit boards, significantly tax our court system's limited resources, and require judges to step significantly beyond their expertise. The district court concluded that "[s]uch a procedure—totally removing from the board of directors any control over litigation brought on behalf of the organization the board is supposed to govern—is clearly untenable." We agree. We see no reason to assume that the courts are better equipped to make business judgments about the merits of a lawsuit brought by a member of a nonprofit corporation than is a properly functioning board of directors whose duty it is to govern and promote the nonprofit corporation's best interests.

There are no characteristics of nonprofits that justify treating nonprofit and for-profit corporations differently in terms of their ability to delegate board authority to independent committees to review the

merits of derivative suits. There are non-profits, like MPRA, that function very much like for-profit corporations and would benefit from the ability to weed out nuisance suits. In addition to pension funds, these nonprofits may include hospitals, schools, and homeowners associations.[4] We are not alone in reaching this conclusion; two other states have used the business judgment rule when reviewing decisions by nonprofit litigation committees: *Finley v. Superior Court,* 80 Cal. App.4th 1152, 96 Cal.Rptr.2d 128, 132 (2000); *Miller v. Bargaheiser,* 70 Ohio App.3d 702, 591 N.E.2d 1339, 1343 (1990).

Refusing nonprofit corporations the ability to create special litigation committees is counter to our common law tradition as well. While statutes govern certain aspects of corporate life, including the initial incorporation, corporate litigation has been largely a creature of the common law. Derivative suits developed during the nineteenth century as an equitable means of protecting corporations and minority shareholders from fraudulent directors. Block, *supra,* at 1380. The first judicial opinions to apply the business judgment rule to the decision of a special litigation committee did not rely on statutory authority, but rather relied upon case law to determine whether a committee could terminate a shareholder lawsuit. Block, *supra,* at 1690–93.

 A nonprofit corporation's power to appoint a special litigation committee, in the absence of a statutory prohibition, may also spring from the existence of corporate "incidental" powers to carry out corporate purposes. *Aiple v. Twin City Barge & Towing Co.,* 274 Minn. 38, 45, 143 N.W.2d 374, 378 (1966) (identifying corporate powers as being limited to "those actions expressly authorized by statute and such as are incidental thereto and necessary to carry them into effect"). It is now universally accepted in corporate jurisprudence that corporations have the ability to exercise incidental or necessary powers:

> Formerly, corporations were viewed as possessing only such powers as were specifically granted to them by the state. This grant of powers was found in the certificate of incorporation * * * or in the special statute granting a charter to the corporation.
>
> * * * *
>
> Today, in all the states, a corporation is deemed to possess all the powers of a natural person except those powers which are specifically forbidden to such corporations by the law. The old concept of a corporation as a bundle of only a few, specifically granted powers, has been replaced by the concept of a corporation as an artificial person, lacking only those powers which the law specifically denies to it.

Howard L. Oleck, *Non–Profit Corporations, Organizations, & Associations* § 168 (6th ed.1994); *see also* 13 William Meade Fletcher, et al., *Fletcher's Cyclopedia of the Law of Private Corporations* § 5963 (perm.ed., rev.vol.1984).

The untenable consequence of concluding the Nonprofit Act prohibits litigation

---

**4.** *See* Peter Frumkin & Alice Andre–Clark, *Nonprofit Compensation and the Market,* 21 U. Haw. L.Rev. 425, 427 (1999) (describing a lawsuit by a trustee of an educational organization against another trustee); *Miller v. Bar-* *gaheiser,* 70 Ohio App.3d 702, 591 N.E.2d 1339, 1341 (1990) (involving a derivative suit on behalf of a nonprofit hospital); *Dockside Ass'n,* 352 S.E.2d at 714 (involving a suit against a property association).

committees, in combination with the common law tradition favoring corporate control of derivative actions, leads us to conclude that nonprofit corporations have the power to create committees that are sufficiently independent to merit judicial deference. We hold the Minnesota Nonprofit Corporations Act does not prohibit corporations from appointing independent committees with the authority to decide whether the corporation should join a member's derivative suit.

## II.

Having determined that nonprofit corporations have the power to create special litigation committees, the question remains whether Murnane deserved the deference of the business judgment rule. The court of appeals concluded that Murnane, as a special litigation committee, failed to meet the threshold test of independence and good faith, and ordered the lawsuit to proceed. We agree and affirm.

■ All the state variations upon the business judgment rule as applied to committees reviewing litigation have two common elements. At a minimum, the board must establish that the committee acted in good faith and was sufficiently independent from the board of directors to dispassionately review the derivative lawsuit. *See, e.g., Grimes v. Donald,* 673 A.2d 1207, 1219 (Del.1996); *Houle,* 556 N.E.2d at 59; *PSE & G,* 801 A.2d at 312; *Auerbach,* 419 N.Y.S.2d 920, 393 N.E.2d at

1000. A key factor in evaluating independence is whether the board delegates to a committee of disinterested persons the board's power to control the litigation. Block, *supra,* at 1689. A mere advisory role of the special litigation committee fails to bestow a sufficient legitimacy to warrant deference to the committee's decision by a court. Thus, we consider whether Murnane conducted his investigation with sufficient independence and good faith to deserve the deference of the business judgment rule. If not, the committee does not receive the court's deference and the derivative suit proceeds.

■ In reviewing Murnane's first report, we conclude that the board failed to establish the independence and good faith of Murnane's investigation.[5] We agree with the district court's determination that Murnane lacked independence because the MPRA's initial resolution restricted his factual investigation. Murnane was told to rely on facts developed by law firms that had been hired to represent MPRA in lawsuits about other legal issues. Additionally, Murnane's independence is suspect because his conduct suggests that he saw his role in conformance with his title: special counsel. Murnane did not talk to Janssen or their attorneys in investigating the suit and gave a conclusion that sounds like legal advice. That behavior belies MPRA's attempt to portray Murnane as a special litigation committee; instead MPRA hired Murnane to serve as its special counsel and he acted more like a legal advisor than a neutral decision maker.

5. We do not adopt a particular version of the business judgment rule for use with Minnesota nonprofit organizations today. Because we hold that Murnane's investigation failed the most minimal version of a business judgment rule, requiring that a litigation committee act in good faith, with independence, we need not reach the question of whether a more exact-

ing standard of judicial review may be appropriate for nonprofit corporations than in the case of for-profit corporations. The members of nonprofits are not akin to diversified shareholders—any risk sustained by them cannot necessarily be spread among their other investments. Nor can they necessarily protect themselves by taking their assets elsewhere.

In addition, we conclude that Murnane did not engage in a good faith attempt to deduce the best interest of MPRA with respect to the litigation against Best & Flanagan. Murnane never interviewed Janssen or their attorneys, a fundamental task in reaching an informed decision about the merits of their complaints. Murnane also gave no indication that he had undertaken the careful consideration of all the germane benefits and detriments to MPRA that is indicative of a good faith business decision. Murnane opined that "the totality of the materials reviewed does not support a finding that Best & Flanagan committed legal malpractice in its handling of the MPRA affairs," and that "to spend money in the pursuit of a legal malpractice claim against Best & Flanagan would not be prudent use of the MPRA funds." The language of his conclusion hints that his decision was that of a special counsel evaluating the likelihood of a legal victory. But a much more comprehensive weighing and balancing of factors is expected in situations like this, taking into consideration how joining or quashing the lawsuit could affect MPRA's economic health, relations between the board of directors and members, MPRA's public relations, and other factors common to reasoned business decisions. See Auerbach, 419 N.Y.S.2d 920, 393 N.E.2d at 1002. We conclude that Murnane's initial investigation of the derivative action instituted by Janssen against Best & Flanagan lacked the independence and good faith necessary to merit deference from this court.

 Implicitly acknowledging the failures in its first resolution and investigation, the MPRA board urges us to consider the second resolution and improved investigation.[6] We decline to do so. Generally, when the committee authorized with making a business decision for the corporation is found to lack the independence needed to grant summary judgment, or where the independence is uncertain, the derivative suit proceeds on its merits. See, e.g., Hasan v. CleveTrust Realty Investors, 729 F.2d 372, 380 (6th Cir.1984); Will v. Engebretson & Co., Inc., 213 Cal.App.3d 1033, 1043–45, 261 Cal.Rptr. 868 (1989); Lewis v. Fuqua, 502 A.2d 962, 972 (Del.Ch.1985); Davidowitz v. Edelman, 153 Misc.2d 853, 858, 583 N.Y.S.2d 340 (Sup.Ct.1992). See also Houle, 556 N.E.2d at 58–60 (reversing summary judgment in favor of defendant board of directors and remanding for an evidentiary hearing before a judge regarding a committee member's independence, and noting that "[u]nless the defendant sustains its burden of proof as to both of those questions, the case should proceed to trial."). The Auerbach court was blunt in its assessment of the consequences when proof of an investigation shows that the investigation is too restricted in scope or so shallow in execution as to constitute a pretext; such proof "would raise questions of good faith * * * which would never be shielded by that doctrine." Auerbach, 419 N.Y.S.2d 920, 393 N.E.2d at 1003 (emphasis added).

The practice of allowing derivative suits to proceed to trial if a corporate board's initial attempt at a business decision fails the minimal requirements for judicial def-

---

**6.** We note that the district court could have deferred the motion in order to simply supplement the record. However, there is a marked difference between allowing a corporation to supply documents that better indicate the process it employed in reaching its business decision, and allowing the corporation to reconst-itute its litigation committee and revamp its investigation. The former is permitted by a judge's authority to continue a summary judgment motion to more fully develop the record; the latter is not supported by the principles underlying the application of the business judgment doctrine.

erence is supported by the principles underlying the application of the business judgment doctrine. We strike a balance between allowing corporations to control their own destiny and permitting meritorious suits by shareholders and members by limiting a board of directors to one opportunity to exercise its business judgment. *See, e.g., Kaplan v. Wyatt*, 484 A.2d 501, 508 (Del.Ch.1984) (explaining that if the court determines the litigation committee failed the minimal review of the business judgment rule, the "court shall deny the motion for such reason and need go no farther, the result being that the shareholder plaintiff may resume immediate control of the litigation"). If the courts allow corporate boards to continually improve their investigation to bolster their business decision, the rights of shareholders and members will be effectively nullified. We conclude that the district court erred in deferring MPRA's motion to dismiss and permitting the board to remedy defects in its first grant of authority to Murnane. We further conclude that Murnane failed to conduct his initial investigation with sufficient independence and good faith to deserve the deference of the business judgment rule and, therefore, hold that the district court erred when it granted MPRA's motion to dismiss the suit against Best & Flanagan.

Affirmed.

GILBERT, J., took no part in the consideration or decision of this case.

HANSON, Justice (concurring in part, dissenting in part).

Although I concur with the decisions that boards of nonprofit corporations are protected by the business judgment rule, that nonprofit corporations may avail themselves of that rule by appointing a special litigation committee to decide whether the corporation should join a members' derivative suit, and that Murnane may be viewed as a special litigation committee, I respectfully dissent on the decision to limit our review to Murnane's first report. The district court did not base its dismissal order on Murnane's first report because it concluded that procedural deficiencies precluded deference to Murnane's recommendations. The district court granted MPRA's motion to dismiss specifically on the basis of Murnane's second report, concluding that it was entitled to deference because it reflected an independent investigation that was conducted in good faith.

I find no authority to support the majority opinion's development of a "one strike you're out" rule for conducting an investigation of claims made in a derivative action. The cases cited by the majority stand only for the proposition that the derivative action proceeds to trial when a motion to dismiss, based on the recommendation of a special litigation committee, is denied. They do not address the question of whether such denial is with prejudice to later renewal or, more specifically applicable here, whether the district court has discretion to defer ruling on the motion to dismiss to allow further investigation. Drawing on the analogy to summary judgment motions generally, the federal decisions are unanimous in holding that the denial of a motion for summary judgment does not become the "law of the case" so as to preclude the later grant of a renewed motion. *See, e.g., Paulson v. Greyhound Lines, Inc.*, 628 F.Supp. 888, 891 (D.Minn. 1986), and cases cited in 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay

Kane, *Federal Practice and Procedure* § 2718 n. 6 (1998). This rule has been recognized by the Minnesota Court of Appeals in *Invest Cast, Inc. v. City of Blaine*, 471 N.W.2d 368, 370 (Minn.App.1991); *Brantner v. Fruehauf Corp.*, 1991 WL 10225 (Minn.App.). Even more to the point are those cases which hold that it is within the trial court's discretion to deny a motion for summary judgment without prejudice to it being renewed at a later time. *See* Wright, Miller and Kane § 2718 n. 5; 2 David F. Herr & Roger S. Haydock, *Minnesota Practice* § 56.11 (1998).

For these reasons, I would not limit review to Murnane's first report. Under these facts, where the deficiencies of the first report resulted from structural impediments imposed by the corporation upon the scope of the special litigation committee's investigation, I would conclude that the district court has discretion to defer (or to deny without prejudice) a motion to dismiss to allow the corporation an opportunity to remove those structural impediments.

Moreover, I would conclude that MPRA did remove the structural impediments to Murnane's investigation and that Murnane's second report did reflect sufficient independence and good faith to warrant dismissal.

In reaching this conclusion, I am persuaded that the deficiencies in Murnane's first report were not the product of any wrongdoing by Murnane, but instead were the necessary result of the structural impediments imposed by MPRA. That conclusion is confirmed by the majority opinion's review of Murnane's first report, which concludes that "Murnane lacked independence because the MPRA's initial resolution restricted his factual investigation." The resolution of the MPRA board,

authorizing Murnane's continuing investigation after his first report, was appropriately broad:

> Special Counsel is not required to assume as correct any portion of the previous reports prepared on behalf of the Board of Directors. Special Counsel is encouraged to solicit facts, argument and other input from the parties to the litigation in such manner and form as Special Counsel deems appropriate. Special Counsel is not limited in any way as to how to conduct his investigation or what material he may consider. Special Counsel shall have complete independence and may undertake whatever good faith investigation he chooses.

The fault in Murnane's first report was cured by his further investigation and second report. Murnane interviewed Janssen and their attorneys, reviewed documents they provided and analyzed the arguments they presented. Murnane considered all of the germane benefits and detriments to MPRA of participating in the litigation.

There may be situations where an initial investigation by a special litigation committee is so tainted that an expanded investigation, at least by the same committee, could not cure the deficiencies in the required independence and good faith. For example, if there was evidence that Murnane had developed some bias or was committed to reach the same recommendation no matter what facts or arguments were brought to his attention, the second report would stand no better than the first. However, I see no evidence that this was the case.

Finally, I cannot agree with the majority opinion's view that Murnane's legal evaluation of the likely outcome of the derivative action somehow discredited the independence or good faith of his investigation.

Although Murnane, as a special litigation committee, was expected to exercise the "business judgment" of a board of directors, that business judgment must be applied to the merits of the derivative action. The best interests of MPRA depend upon an objective assessment of whether the likely outcome of the derivative action justifies the expenditure of time, effort and collegiality. In such a cost-benefit analysis, the potential benefit depends directly upon the likelihood of a favorable outcome in the litigation—the less likely a favorable outcome, the less benefit.

Murnane's report concludes that there would be no benefit to participating in the derivative action—"the association would be unsuccessful in prosecuting a cause of action against Best & Flanagan, Brian Rice and Charles Berquist"—but that the cost would be significant, despite the willingness of Janssen's counsel to proceed on a contingent fee basis—"the ongoing viability of the association and a harmonious relationship between its board of directors and legal counsel" would be adversely affected. This is precisely the type of business judgment that a special litigation committee is expected to make and, when made in good faith by a committee that is independent of the corporation's board, it is entitled to deference by the court. Accordingly, I would reverse the court of appeals and conclude that the district court did not err when it dismissed the derivative action based on Murnane's second report and recommendation.

BLATZ, Chief Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Hanson.