**In re UNITEDHEALTH GROUP INCORPORATED SHAREHOLDER DERIVATIVE LITIGATION.**

**and**

**In re UnitedHealth Group Incorporated PSLRA Litigation.**

**No. A08–114.**

Supreme Court of Minnesota.

Aug. 14, 2008.

Garrett Dennis Blanchfield, Jr., Reinhardt Wendorf & Blanchfield, St. Paul, MN, for plaintiff.

Karl L. Cambronne, Chestnut & Cambronne, Minneapolis, MN, for plaintiff.

Andrew J. Brown, Coughlin Stoia, San Diego, CA, for plaintiff.

Barbara Podlucky Berens, Kelly & Berens, Minneapolis, MN, for defendant.

Peter William Carter, Marianne D. Short, Dorsey & Whitney, Minneapolis, MN, for defendant.

David L. Hashmall, Felhaber Larson, Minneapolis, MN, for defendant.

Richard G. Mark, Daniel John Supalla, Briggs and Morgan, Minneapolis, MN, for defendant.

Seth L. Levine, Foley & Lardner, New York, NY, for defendant.

Alexandra Shapiro, Blair Connelly, David M. Brodsky, Lori Alvino McGill, Latham & Watkins, New York, NY, for defendant.

Jeffrey Jerome Harrington, Assistant Attorney General, St. Paul, MN, amicus.

Vernon J. Vanderweide, Head, Seifert & Vanderweide, Minneapolis, MN, intervenor.

OPINION

ANDERSON, G. BARRY, Justice.

This case arises from a certified question from the United States District Court for the District of Minnesota regarding the extent to which a court, in deciding whether to approve a proposed settlement of a shareholder derivative action, must defer to the decision of a special litigation committee "SLC" that the derivative action should be settled on specific terms.

In 2006 the *Wall Street Journal* reported that executives at various U.S. corporations received stock options on dates that coincided with a low price (or, in some cases, the lowest price for a given time frame) and that those options appeared to have been backdated.[1] *See* Charles Fo-

1. Backdating stock options, the article explained, is problematic because it brings "an instant paper gain," which, under accounting rules, is "equivalent to extra pay and thus is a cost to the company." Charles Forelle & James Bandler, *The Perfect Payday,* Wall St. J., Mar. 18, 2006, at A1. Failure to recognize this cost as a matter of corporate accounting may, in turn, mean that the company has overstated its profits, possibly necessitating a restatement of past financial results. *Id.* Backdating, in and of itself, is not illegal "as long as it is duly authorized by the board, fully disclosed, and reported in keeping with

relle & James Bandler, *The Perfect Payday,* Wall St. J., Mar. 18, 2006, at A1. Among the corporations discussed in the article was UnitedHealth Group, Inc. ("UnitedHealth"), *see id.*, a Minnesota corporation with its principal executive offices in Minnetonka. The article noted that Dr. William McGuire, CEO and chairman of the board of UnitedHealth, received UnitedHealth stock options that might have been backdated. *Id.* McGuire subsequently resigned from his position at UnitedHealth.

Shortly after the publication of the *Wall Street Journal* article, a number of actions were brought against McGuire and other UnitedHealth executives, including (1) federal shareholder derivative litigation, (2) federal securities class actions under the Private Securities Litigation Reform Act ("PSLRA litigation"), and (3) state derivative suits under Minnesota law. The state derivative suits were brought in Minnesota district court, whereas the federal derivative litigation and PSLRA litigation were brought in the United States District Court for the District of Minnesota. The Securities Exchange Commission brought its own action against McGuire; the parties reached a settlement in which McGuire agreed to return $400 million to UnitedHealth and pay a $7 million civil fine. In settling the SEC action, McGuire agreed not to "make or permit to be made any public statement denying, directly or indirectly, any allegation in the [SEC] complaint or creating the impression that the complaint is without factual basis."

On July 19, 2006, UnitedHealth's board passed a resolution creating a two-member SLC under Minn.Stat. § 302A.241, subd. 1 (2006).[2] Both members of the SLC are former justices of this court. The board resolution conferred on the SLC "complete power and authority to investigate [the derivative claims] and analyze the legal rights or remedies of the Company and determine whether those rights or remedies should be pursued." In the resolution, the board also retained the ability to expand the size of the SLC as it deemed appropriate. On November 29, 2006, the federal district court issued a preliminary injunction preventing McGuire from exercising any UnitedHealth stock options without court approval. The injunction was set to expire after the SLC issued its report.

Following an extensive investigation, the SLC issued its report on December 6, 2007. In the report, the SLC set forth the legal standards and defenses applicable to each derivative claim. Citing the "ongoing federal securities fraud actions involving similar allegations," however, the SLC declined to provide any detailed factual bases for its conclusions. In the end, the SLC determined that a number of the claims "may have merit" and recommended settlement of the claims against McGuire and settlement or dismissal of the claims against the other named defendants. Un-

tax rules." M.P. Narayanan et al., *The Economic Impact of Backdating of Executive Stock Options,* 105 Mich. L.Rev. 1597, 1601–02 (2007).

2. Minnesota Statutes § 302A.241, subd. 1, provides as follows:

> A resolution approved by the affirmative vote of a majority of the board may establish committees having the authority of the board in the management of the business of the corporation only to the extent provided in the resolution. Committees may include a special litigation committee consisting of one or more independent directors or other independent persons to consider legal rights or remedies of the corporation and whether those rights and remedies should be pursued. Committees other than special litigation committees ... are subject at all times to the direction and control of the board.

der the terms of the proposed settlement, McGuire would relinquish approximately $320 million in UnitedHealth stock options, surrender his rights to his UnitedHealth retirement plan and executive savings plan, and relinquish any claim he might have had to post-employment benefits. The total economic value McGuire would relinquish under the settlement amounted to approximately $420 million.

On the basis of the recommended settlement with McGuire, the federal derivative plaintiffs joined with the defendants to request the lifting of the preliminary injunction on McGuire's stock options in excess of the proposed settlement. *In re UnitedHealth Group Inc. S'holder Derivative Litig.*, Nos. 06–CV–1216, 06–CV–1691, 2007 WL 4571127, at *2 (D.Minn. Dec. 26, 2007). But one party, the California Public Employees' Retirement System ("CalPERS"), requested that the injunction be maintained, fearing that "release of the funds will jeopardize its ability to collect a judgment, should it prevail in the PSLRA litigation." *Id.*

Applying federal precedent regarding the termination of preliminary injunctions, the federal district court considered the factors set forth in *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109, 113 (8th Cir.1981).[3] *UnitedHealth,* 2007 WL 4571127, at *2. In its evaluation of CalPERS's chance of success on the merits, the court noted a "significant probability" of success, based in part on what the court construed as McGuire's admission of wrongdoing to the SEC. *Id.* at *5–6. Nevertheless, the court believed that "the ultimate question" was whether the UnitedHealth board could in good conscience release approximately $800 million in compensation to an individual who could not deny substantial malfeasance in his capacity with the company. *Id.* at *6. The court noted that although the SLC had "apparently made a business judgment favoring settling the Board's and UHG's possible claims," the SLC's "lack of any findings leaves no tracks showing why or how its business judgment can be considered reasonable." *Id.* The court stated that if Minnesota law permitted a more searching analysis, then "there may be a ground upon which to preserve additional assets pending approval of the settlement." *Id.*

Declining to speculate on the scope of Minnesota law, the district court chose to certify to this court the following question: "Does Minnesota's business judgment rule foreclose a court from a) examining the reasonableness of, or b) rejecting on the merits, a settlement of a derivative action proposed by a Special Litigation Committee duly constituted under Minnesota Statutes § 302A.241 subd. 1?" *UnitedHealth,* 2007 WL 4571127, at *8. We accepted the certified question, which we reformulated to read as follows:

> To what extent does the business judgment rule as recognized in Minnesota law require a court, in deciding whether to approve a proposed settlement of a shareholder derivative action, to defer to the decision of a Special Litigation Committee duly constituted under Minn.Stat. § 302A.241, subd. 1 (2006), that the derivative action should be settled on specific terms?

## I.

█ Under Minn.Stat. § 480.065, subd. 3 (2006), we "may answer a question of law certified ... by a court of the United

3. Under *Dataphase,* a federal court considers "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." 640 F.2d at 113.

States ... if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this state." A certified question is a question of law that we review de novo. *Clark v. Lindquist,* 683 N.W.2d 784, 785 (Minn.2004). The certified question before us requires that we consider three distinct legal concepts: shareholder derivative suits, special litigation committees, and the business judgment rule.

A shareholder derivative suit is a creation of equity in which a shareholder may, in effect, "step into the corporation's shoes and ... seek in its right the restitution he could not demand in his own." *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 548, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). "Derivative suits allow shareholders to bring suit against wrongdoers on behalf of the corporation, and force liable parties to compensate the corporation for injuries so caused." *Janssen v. Best & Flanagan,* 662 N.W.2d 876, 882 (Minn.2003). "A derivative action actually belongs to the corporation, but the shareholders ... bring the action where the corporation has failed to take action for itself." *Id.* In a derivative action, the plaintiff essentially brings two claims: "one against the directors for failing to sue; the second based upon the right belonging to the corporation." *Brown v. Tenney,* 125 Ill.2d 348, 126 Ill.Dec. 545, 532 N.E.2d 230, 232 (1988). Shareholder derivative actions provide concerned shareholders a check against abuses committed by corporate executives, but they also provide disruptive shareholders an opportunity to abuse the legal system. *Cohen,* 337 U.S. at 548, 69 S.Ct. 1221. Some derivative actions—for example, strike suits[4]—are "brought not to redress real wrongs, but to realize upon their nuisance value." *Id.*

In Minnesota, a board of directors may create a special litigation committee "consisting of one or more independent directors or other independent persons to consider legal rights or remedies of the corporation and whether those rights and remedies should be pursued." Minn.Stat. § 302A.241, subd. 1. "Committees other than special litigation committees ... are subject at all times to the direction and control of the board." *Id.* By implication, then, an SLC is not subject to a board's direction and control.

Although a derivative suit belongs to the corporation rather than to the shareholders, a board's refusal to sue does not necessarily prevent the continuation of a derivative suit if the board members suffer from a conflict of interest.[5] *See, e.g., United Copper Sec. Co. v. Amalgamated Copper Co.,* 244 U.S. 261, 263–64, 37 S.Ct. 509, 61 L.Ed. 1119 (1917) (stating that a court seldom interferes with a corporation's decision not to sue unless the "wrongdoers control the corporation"). Special litigation committees thus enable a

4. A strike suit is defined as "[a] suit (esp. a derivative action), often based on no valid claim, brought either for nuisance value or as leverage to obtain a favorable or inflated settlement." *Black's Law Dictionary* 1475 (8th ed.2004).

5. We have indicated that a shareholder bringing a derivative action must first demand that the board itself pursue the action. *See PJ Acquisition Corp. v. Skoglund,* 453 N.W.2d 1, 5, 6 n. 12 (Minn.1990). The demand requirement may be excused, however, when the board suffers from a conflict of interest regarding the subject matter of the derivative suit. *See Winter v. Farmers Educ. & Coop. Union of Am.,* 259 Minn. 257, 266–67, 107 N.W.2d 226, 233 (1961) ("Ordinarily a demand should be made on the board of directors unless the wrongdoers constitute a majority of the board....").

corporation to dismiss or settle a derivative suit despite a conflict of interest on the part of some or all directors. But a court will defer to the decision of an SLC only "[i]f the board properly delegates its authority to act to the [SLC]." *Janssen,* 662 N.W.2d at 884. In other words, the SLC and its investigation must satisfy the requirements of the business judgment rule.

The business judgment rule is a presumption "developed by state and federal courts to protect boards of directors against shareholder claims that the board made unprofitable business decisions." *Id.* at 882. Under the business judgment rule, so long as a disinterested director makes "an informed business decision, in good faith, without an abuse of discretion, he or she will not be liable for corporate losses resulting from his or her decision." *Id.; see also* Minn.Stat. § 302A.251 (2006). The business judgment rule is premised on (1) the notion that "protecting directors' reasonable risks is . . . positive for the economy overall, as those risks allow businesses to attract risk-averse managers, adapt to changing markets, and capitalize on emerging trends"; and (2) the recognition that "courts are ill-equipped to judge the wisdom of business ventures and have been reticent to replace a well-meaning decision by a corporate board with their own." *Janssen,* 662 N.W.2d at 882.

The business judgment rule typically operates as a defense to director liability, *see, e.g., Unitrin, Inc. v. Am. Gen. Corp.,* 651 A.2d 1361, 1374 (Del.1995), but it has also been applied to decisions made by SLCs, *see, e.g., Zapata Corp. v. Maldonado,* 430 A.2d 779, 787 (Del.1981); *Auerbach v. Bennett,* 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994, 999–1000 (1979). It is the proper application of the business judgment rule in the SLC context that is at the heart of the certified question before us.[6]

## II.

### A. *Minn. R. Civ. P. 23.09 and Fed. R.Civ.P. 23.1*

We begin our analysis of the certified question by considering the contention that Minn. R. Civ. P. 23.09 and Fed. R.Civ.P. 23.1 define the boundaries of the Minnesota business judgment rule. Under Minn. R. Civ. P. 23.09, a derivative suit "shall not be dismissed or compromised without the approval of the court." The state plaintiffs assert that this rule forecloses the application of the business judgment rule; the PSLRA plaintiffs and the Minnesota Attorney General make similar arguments. These arguments implicate the *Erie* doctrine concerning the applicability of state procedural law in federal court. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

It is well-settled under the *Erie* doctrine that federal courts sitting in diversity apply state substantive law and federal procedural law. *Gasperini v. Ctr. for Humanities,* 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). The *Erie* doctrine also applies when a federal court exercises supplemental jurisdiction

6. According to one commentator, courts have ignored the distinction between the business judgment rule, which protects directors from liability for their decisions, and the business judgment doctrine, which protects the decision itself. *See* Joseph Hinsey IV, *Business Judgment and the American Law Institute's Corporate Governance Project: The Rule, the Doctrine, and the Reality,* 52 Geo. Wash. L.Rev. 609, 611–12 (1984). Although the term "business judgment doctrine" more accurately describes the rule as applied in the SLC context, we utilize the term "business judgment rule" consistent with the majority of reported cases on this subject.

over state law claims. *See Felder v. Casey,* 487 U.S. 131, 151, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988). Because the federal district court in this instance is exercising supplemental jurisdiction over matters of state law, we must determine whether Rule 23.09 is substantive or procedural. A court determines whether a rule is substantive or procedural by examining whether the rule is "outcome-determinative." *Hanna v. Plumer,* 380 U.S. 460, 468, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). To ascertain whether a rule is outcome-determinative, in turn, a court considers how a failure to apply that rule would implicate the "twin aims" of the *Erie* doctrine—"discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Id.*

In accordance with the *Erie* doctrine, we hold that Rule 23.09 is a procedural rule and therefore cannot be applied by a federal court exercising supplemental jurisdiction over claims asserted under state law. A failure to apply Rule 23.09 instead of Fed.R.Civ.P. 23.1 implicates neither of the core *Erie* concerns identified in *Hanna.* Because the language of Rule 23.09 substantially mirrors that of its federal counterpart, it is unlikely that a party would choose a federal forum to evade the strictures of the rule. *See* Fed.R.Civ.P. 23.1(c) ("A derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval."). Furthermore, because Rule 23.09 sets forth no substantive standards to guide the consideration and approval of a settlement and grants no rights that one party may enforce against another, it is unlikely that a failure to apply Rule 23.09 rather than the similar federal rule would lead to inequitable results. Finally, even if Rule 23.09 were substantive, it would be invalid under Minn.Stat. § 480.051 (2006), which forbids the promulgation of procedural rules that "abridge, enlarge, or modify the substantive rights of any litigant." Because Minn. R. Civ. P. 23.09 is clearly procedural, its scope has no relevance to our analysis of the certified question.

Under Fed.R.Civ.P. 23.1(c), a shareholder derivative action "may be settled, voluntarily dismissed, or compromised only with the court's approval." The lead plaintiffs assert that this rule mandates review of a proposed settlement for its reasonableness and fairness, regardless of the content of the Minnesota business judgment rule. In essence, the lead plaintiffs urge us to interpret Rule 23.1(c) so as to foreclose application of the Minnesota business judgment rule to proposed derivative settlements.

Because the federal district court did not—and could not—certify to this court a question of federal procedural law, we decline to address the lead plaintiffs' argument. As a number of courts have observed, the certified question process provides no opportunity for a state court to render an opinion on matters of federal law. *See, e.g., Ramos v. Town of Vernon,* 254 Conn. 799, 761 A.2d 705, 718 (2000); *Mardirossian v. Paul Revere Life Ins. Co.,* 376 Md. 640, 831 A.2d 60, 64 (2003); *Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc.,* 407 Mass. 675, 555 N.E.2d 568, 574 (1990). Thus, Fed.R.Civ.P. 23.1 is not properly before us at this time.

### *B. Minn.Stat. § 302A.241 and Minn. Stat. § 302A.251*

Having disposed of the parties' arguments regarding Minn. R. Civ. P. 23.09 and Fed.R.Civ.P. 23.1, we now consider whether Minnesota statutes mandate that courts afford a particular level of deference to an SLC's decision to settle a derivative action. Minnesota Statutes § 302A.241, subd. 1, provides for the creation of SLCs "consisting of one or more

independent directors or other independent persons to consider legal rights or remedies of the corporation and whether those rights and remedies should be pursued." Because section 302A.241, subd. 1, does not addresses the deference to be afforded an SLC's decision to settle a derivative action, it cannot be read to dictate any particular resolution of the certified question.[7] The statute does require, however, that the members of an SLC be "independent." *See id.*

We next turn to Minn.Stat. § 302A.251, which sets forth the business judgment rule as a defense against director liability.[8] Under section 302A.251, subd. 1, a director "is not liable by reason of being or having been a director of the corporation" for any action discharged "in good faith, in a manner [he or she] reasonably believes to be in the best interests of the corporation." A director may rely on opinions or factual information provided by "officers or employees of the corporation" so long as the director reasonably believes them to be "reliable and competent in the matters presented." *Id.*, subd. 2(a)(1). Furthermore, a corporation may eliminate or limit a director's liability for actions taken in his or her capacity as director, but only if those actions were not taken in bad faith, *id.*, subd. 4(b), and did not involve transactions in which the director received an "improper personal benefit," *id.*, subd. 4(d). "Committee members are deemed to be directors for purposes of section[ ] 302A.251...." Minn.Stat. § 302A.241, subd. 7 (2006).

Section 302A.251 is not controlling because it does not address the deference to be afforded the decision of an SLC. But the statute does inform our resolution of the certified question. First, section 302A.251 indicates that good faith is a prerequisite to the application of the business judgment rule. Minn. State. § 302A.251, subds. 1, 4(b). Additionally, in permitting reliance upon individuals reasonably believed to be reliable and competent, the statute indicates that some focus should be placed on the fact-gathering processes undertaken by the decisionmaker. *Id.*, subd. 2. Finally, in providing that a director may not be indemnified by the corporation for decisions that result in his or her receipt of a wrongful benefit, the statute also indicates that the disinterestedness of the director should be considered. *Id.*, subd. 4(d).

*C. Janssen v. Best & Flanagan*

Turning to our own precedent for guidance in resolving the certified question, we observe that our only case addressing the business judgment rule in the context of an SLC decision is *Janssen v. Best & Flanagan,* 662 N.W.2d 876 (Minn.2003). In *Janssen,* members of a nonprofit corporation brought a derivative suit concerning a failed business investment. *Id.* at 879. In response, the nonprofit appointed an attorney to act as an SLC and assess what action, if any, the board should take, but

7. We note that the predecessor statute to section 302A.241 provided that "[t]he good faith determinations of the committee are binding upon the corporation and its directors, officers, and shareholders." Minn.Stat. § 302A.243 (1986). But the legislature stated that "the repeal of [section 302A.243] does not imply that the legislature has accepted or rejected the substance of the repealed section but must be interpreted in the same manner as if [it] had not [been] enacted." Act of May 19, 1989, ch. 172, § 12, 1989 Minn. Laws 421, 429. Accordingly, we can ascribe no import to the predecessor statute.

8. We will refer to this application of the business judgment rule as the "business judgment liability rule" so as to avoid confusion with the business judgment rule applicable to SLC decisions. *See supra* note 6.

the board instructed the attorney to accept as correct the factual findings made during two earlier investigations into the investment. *Id.* at 880. The attorney recommended dismissal of the litigation, and the nonprofit moved for the derivative suit to be dismissed. *Id.* The district court dismissed the suit, but the court of appeals reversed, determining that the "threshold test of the business judgment rule" had not been met. *Id.*. at 881.

We observed in *Janssen* that every variation of the business judgment rule, as applied to SLCs, contains two essential elements: "At a minimum, the board must establish that the committee acted in good faith and was sufficiently independent from the board of directors to dispassionately review the derivative lawsuit." *Id.* at 888. Because the attorney had been told by the nonprofit how to conduct his investigation, we determined that his recommendation did not warrant any deference. *Id.* Concluding that the attorney's "investigation failed the most minimal version of a business judgment rule," we refused to "adopt a particular version of the business judgment rule for use with Minnesota nonprofit organizations." *Id.* at 888 n. 5

*Janssen* represents neither an acceptance nor a rejection of any particular permutation of the business judgment rule. Recognizing the need for caution in a unique circumstance, we merely set forth the minimal requirements of the business judgment rule—good faith on the part of the SLC and independence from the board of directors. *Id.* at 888 & n. 5. The concurrence misinterprets *Janssen* as indicating "that the business judgment rule does not shelter decisions that are irrational or unreasonable." Although we did state in *Janssen* that " '[t]he business judgment rule is a presumption protecting conduct by directors that can be attributed to any rational business purpose,' " *id.* at 882 (quoting Dennis J. Block et al., *The Business Judgment Rule: Fiduciary Duties of Corporate Directors* 18 (5th ed.1998)), this statement was based on a treatise, not precedent, and it was not part of our narrow holding that the two elements of the business judgment rule are good faith and independence, *id.* at 888.

To say that we endorsed no particular approach to the business judgment rule is not to suggest the absence of guidance for our resolution of the certified question. First, we acknowledged in *Janssen* that every jurisdiction's business judgment rule requires, at a minimum, analysis of an SLC's good faith and independence. *Id.* Second, by giving no deference to an improperly constituted SLC, we implied that no deference is to be given to the decision of a conflicted board of directors that never attempted to create an independent SLC in the first place. *See id.* Certainly, it would be most unusual if, by simply declining to create an SLC, a board having a conflict of interest was entitled to more deference than if it had created an SLC later deemed faulty in litigation. Third, we indicated that the board bears the burden of proof to establish that the business judgment rule has been satisfied. *See id.* (stating that "the board must establish that the committee acted in good faith and was sufficiently independent"). Finally, we clarified that a board has one opportunity to properly convene an SLC, which itself has only one opportunity to conduct a proper investigation. *Id.* at 889–90.

## III.

### A. *Auerbach* and *Zapata*

Other jurisdictions have fallen largely in line with the opposing views adopted by the New York and Delaware courts regarding the deference to be afforded an SLC's decision to settle a derivative action. These two competing approaches underlie

the dispute between the parties that have filed briefs with this court.

In *Auerbach v. Bennett,* the New York Court of Appeals articulated the deference due an SLC's decision as follows:

> While the substantive aspects of a decision to terminate a shareholders' derivative action against defendant corporate directors made by a committee of disinterested directors appointed by the corporation's board of directors are beyond judicial inquiry under the business judgment doctrine, the court may inquire as to the disinterested independence of the members of that committee and as to the appropriateness and sufficiency of the investigative procedures chosen and pursued by the committee.

47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994, 996 (1979).

The court in *Auerbach* stated that the business judgment "rule shields the deliberations and conclusions of the [SLC] only if [the SLC's members] possess a disinterested independence and do not stand in a dual relation which prevents an unprejudicial exercise of judgment." *Id.* at 1001. Furthermore, the court explained that judicial review of "the adequacy and appropriateness of the committee's investigative procedures and methodologies" is permissible. *Id.* at 1002. According to the court, "those responsible for the procedures by which the business judgment is reached may reasonably be required to show that they have pursued their chosen investigative methods in good faith." *Id.* at 1002–03.

The New York Court of Appeals stated that it would be improper to review an SLC's substantive decision, which involves "the weighing and balancing of legal, ethical, commercial, promotional, public relations, fiscal and other factors familiar to the resolution of many if not most corporate problems." *Id.* at 1002. Because "courts are ill equipped and infrequently called on to evaluate what are and must be essentially business judgments" made in the operation of a business, *id.* at 1000, the court forbade any inquiry into "which factors were considered by [the SLC] or the relative weight accorded them in reaching that substantive decision," *id.* at 1002. "[B]y definition," the court explained, "the responsibility for business judgments must rest with the corporate directors; their individual capabilities and experience peculiarly qualify them for the discharge of that responsibility." *Id.* at 1000.

In sum, the business judgment rule adopted in *Auerbach* requires a court to defer to the decision of an SLC if (1) the SLC is independent from the board of directors and (2) the SLC utilized appropriate investigative procedures and methodologies and pursued its investigation in good faith. A number of jurisdictions follow the *Auerbach* approach. *See, e.g., Roberts v. Ala. Power Co.,* 404 So.2d 629, 632 (Ala.1981); *Desaigoudar v. Meyercord,* 108 Cal.App.4th 173, 133 Cal.Rptr.2d 408, 418–19 (2003); *Hirsch v. Jones Intercable, Inc.,* 984 P.2d 629, 637–38 (Colo.1999); *Miller v. Bargaheiser,* 70 Ohio App.3d 702, 591 N.E.2d 1339, 1343 (1990); *see also Atkins v. Hibernia Corp.,* 182 F.3d 320, 325 (5th Cir.1999) (making "best *Erie* guess" that Louisiana courts would apply *Auerbach* ).

In *Zapata Corp. v. Maldonado,* the Delaware Supreme Court rejected the approach adopted by the New York Court of Appeals in *Auerbach,* emphasizing that "there is sufficient risk ... to justify caution beyond adherence to the theory of business judgment." 430 A.2d 779, 787 (Del.1981). The court set forth a two-step process for reviewing the decision of an SLC. *Id.* at 788–89. The first step, similar to the *Auerbach* standard, requires evaluation of the "independence and good faith of

the [SLC] and the bases supporting its conclusions." *Id.* at 788. If the corporation demonstrates independence and good faith, then a court "may proceed, in its discretion," to the second step, in which the court "appl[ies] its own independent business judgment." *Id.* at 789. In applying its own business judgment, a court considers "how compelling the corporate interest in dismissal is when faced with a non-frivolous lawsuit" and gives special consideration to "matters of law and public policy." *Id.* A reviewing court may approve of the dismissal of a derivative suit "subject ... to any equitable terms or conditions [it] finds necessary or desirable." *Id.*

The *Zapata* court provided the following rationale for allowing courts to apply their own business judgment to an SLC's decision:

> [W]e must be mindful that directors are passing judgment on fellow directors in the same corporation and fellow directors, in the same instance, who designated them to serve both as directors and committee members. The question naturally arises whether a "there but for the grace of God go I" empathy might not play a role. And the further question arises whether inquiry as to independence, good faith and reasonable investigation is sufficient safeguard against abuse, perhaps subconscious abuse.

*Id.* at 787. A number of jurisdictions have adopted some form of the *Zapata* framework. *See, e.g., Joy v. North,* 692 F.2d 880, 891 (2d Cir.1982) (applying Connecticut law); *Abella v. Universal Leaf Tobacco Co.,* 546 F.Supp. 795, 799 (E.D.Va.1982); *Houle v. Low,* 407 Mass. 810, 556 N.E.2d 51, 59 (1990); *Alford v. Shaw,* 320 N.C. 465, 358 S.E.2d 323, 326 (1987); *House v. Estate of Edmondson,* 245 S.W.3d 372, 382 (Tenn.2008).

### *B.* Auerbach *is more compelling*

The reasons for adopting a test modeled on the *Auerbach* standard are numerous and compelling. First, the New York Court of Appeals properly recognized that courts are not qualified to evaluate the business judgment of an SLC, explaining that "the business judgment doctrine, at least in part, is grounded in the prudent recognition that courts are ill equipped and infrequently called on to evaluate what are and must be essentially business judgments." 419 N.Y.S.2d 920, 393 N.E.2d at 1000. Indeed, "judges *really* are not equipped either by training or experience to make business judgments because such judgments are intuitive, geared to risk-taking and often reliant on shifting competitive and market criteria.... Whether to pursue litigation is not a judicial decision, rather, it is a business choice." *Joy,* 692 F.2d at 898 (Cardamone, J., concurring in part, dissenting in part).

Second, even if courts were qualified to make business judgments, it is unclear how a court's "business judgment" should be defined for purposes of reviewing an SLC's decision. By its very nature, an individual's business judgment is a unique amalgamation of many factors, including but not limited to personal experience, education, and general business philosophy. The adoption of a nebulous "business judgment" standard allowing for unpredictable results would endorse a standard that is, in fact, no standard at all. Regardless of the good faith and independence of an SLC, the *Zapata* rule allows a court to set aside an SLC's decision based on little more than a disagreement concerning matters of business administration.

Third, the very nature of a shareholder derivative suit is that the cause of action, although brought by a shareholder, belongs to the corporation. *See Janssen,*

662 N.W.2d at 882. Accordingly, the corporation should have the prerogative of weighing the benefits and detriments of bringing a lawsuit. Even where egregious harm has been caused by bad faith conduct on the part of directors or officers, the corporation may conclude that a lawsuit is not in the corporation's best interests for reasons such as adverse publicity, cost of litigation, or disruption of the work force. *See Joy,* 692 F.2d at 899 (Cardamone, J., concurring in part, dissenting in part). As explained by the Alabama Supreme Court, "When an [SLC] decides not to bring an action on behalf of the corporation, the directors are not authorizing or condoning the alleged wrongful acts but are merely saying that given the fact that the events did occur, it is not in the best interest of the corporation to pursue a legal remedy." *Roberts,* 404 So.2d at 632.

Fourth, the *Auerbach* standard avoids the "lengthy and complicated" proceedings that characterize business judgment determinations under *Zapata.* Dennis J. Block & H. Adam Prussin, *The Business Judgment Rule and Shareholder Derivative Actions: Viva Zapata?,* 37 Bus. Law. 27, 58 (1981). Indeed, "the *Zapata* test ... is so open-ended, so complicated, and so subject to judicial whimsy—which it seems to encourage—that ... motions can never be the simple, inexpensive and straightforward proceedings which a corporation needs if it is going to eliminate detrimental derivative litigations in a rational way." *Id.* at 62. The exercise of a court's business judgment requires "significant discovery" into the corporation's operations and lengthy hearings at which the evidence is presented to the court. Franklin A. Gevurtz, *Who Represents the Corporation? In Search of a Better Method for Determining the Corporate Interest in Derivative Suits,* 46 U. Pitt. L.Rev. 265, 301–02 (1985). As a result, derivative litigation, rather than providing a timely resolution of the conflict between the shareholders and management, will become "bog[ged] down in protracted disputes over peripheral issues." *Id.* at 305. "To spend months or years litigating over whether it is a good idea to litigate not only results in a waste of judicial resources, it also inevitably fuels disrespect for the courts." *Id.*

Fifth, allowing courts to second-guess the decision of an SLC undermines the SLC process itself, denying corporations a vital means of avoiding strike suits and other abusive derivative litigation. "Prior to *Zapata,* a corporation could assume that it could dismiss a derivative suit if the suit was contrary to the shareholders' best interests." Daniel R. Fischel, *The "Race to the Bottom" Revisited: Reflections on Recent Developments in Delaware's Corporation Law,* 76 Nw. U.L.Rev. 913, 942 (1982). But "[a]fter *Zapata,* the same corporation must face the prospect that a court exercising 'independent business judgment' and considering questions of 'public policy' will allow the suit to go forward." *Id.* If SLCs are unable to structure their investigations in a manner that can withstand judicial scrutiny, corporations have considerably less reason to go through the substantial trouble and expense of constituting an SLC in the first place, particularly if it is uncertain whether the SLC's decision will stave off costly derivative litigation.

Sixth, a court applying its "business judgment" is prone to act on its own biases and predilections. Ironically, then, *Zapata* simply replaces the danger of bias on the part of the corporate directors and the SLC with the danger of bias on the part of the court. The business judgment rule should *eliminate* bias to the greatest extent possible, not simply reallocate it from one professional to another. As one commentator has observed, any danger of bias in the SLC process is likely to be corrected by natural market forces. *See* Stephen

M. Bainbridge, *The Business Judgment Rule as Abstention Doctrine,* 57 Vand. L.Rev. 83, 122 (2004). Competition between firms provides even the most self-interested directors with a strong incentive to make good (i.e., profitable) decisions; directors who prove themselves incapable of making profitable decisions will inevitably be replaced by others who are more capable. Whereas "[m]arket forces work an imperfect Darwinian selection on corporate decision makers, ... no such forces constrain erring judges." *Id.* As a result of the relative inability of the market to rectify a court's erroneous business decision, "rational shareholders will prefer the risk of director error to that of judicial error." *Id.*

Finally, the *Zapata* court's notion that a court may countermand the business judgment of an SLC based on "matters of ... public policy" is indefensible. 430 A.2d at 789. "[P]resumably the *Zapata* court meant that even though the costs of the suit outweigh its probable gains to the company, the action may be allowed to continue if the suit serves some overriding public purpose in deterring corporate wrongdoing." Gevurtz, *supra,* at 300. It is a troubling rule of law that compels a party to proceed with litigation because some greater public good, as determined by a court that will not have to live with the consequences of the decision, might result.

We recognize that the standard we adopt has been subject to criticism as well, but we consider this criticism to be largely unfounded. Some argue, for example, that *Auerbach* sets forth a rule that, if adopted wholesale by this nation's courts, could "presage the demise of the derivative suit." George W. Dent, Jr., *The Power of Directors to Terminate Shareholder Litigation: The Death of the Derivative Suit?,* 75 Nw. U.L.Rev. 96, 109 (1980). While such concerns may have been legitimate in the early days of the *Auerbach* standard, they have simply failed to play out over the last 29 years—as should be apparent from the sizeable settlement presently before us.

We also reject the argument of *Auerbach's* critics that structural bias is a phenomenon that requires an extraordinary level of judicial intervention. *See Zapata,* 430 A.2d at 787; *Miller v. Register & Tribune Syndicate, Inc.,* 336 N.W.2d 709, 716 (Iowa 1983) (explaining that the "structural bias" argument "suggests that it is unrealistic to assume that the members of independent committees are free from personal, financial or moral influences which flow from the directors who appoint them"). As a general matter, it seems unlikely that a member of an SLC will reach a decision that could harm the company merely because he or she feels some empathy for the individuals under investigation. The members of an SLC will almost certainly be professionals, individuals who have dedicated their careers to building reputations in the business community and who would be particularly loath to risk those reputations simply for the sake of empathy. More specifically, we note that the UnitedHealth SLC was composed not of independent board members, but of two former members of the judiciary who, until their appointment to the SLC, had no discernible connection to the UnitedHealth board. Even if independent directors are at risk of acting on their strong empathy for their fellow directors, we cannot see how that empathy would factor into the decision of an SLC composed of individuals drawn from so far outside the corporate ranks. We believe that careful scrutiny of an SLC's independence and investigative procedures is a sufficient protection against any structural bias.

Finally, some critics might argue that an SLC's decision to dismiss or settle—rather than pursue—what appears to be a meritorious claim is itself a sign that the derivative process has been undermined. *See* James D. Cox, *Searching for the Corporation's Voice in Derivative Suit Litigation: A Critique of* Zapata *and the ALI Project*, 1982 Duke L.J. 959, 963 (1982) (noting concern that SLCs almost uniformly recommend against maintaining derivative litigation). As to the dismissal of a meritorious claim, we find little cause for concern under the rule we set forth today, which ensures a robust review of the SLC and its investigative procedures. Further, it must be remembered that the dismissal of meritorious litigation may be justifiable, such as when pursuit of the claim will prove more costly than beneficial. As to the settlement of a meritorious claim, it is a fact of modern legal practice that settlements are commonplace and the rule rather than the exception; moreover, it is broadly acknowledged that settlements are favored because they "conserve[ ] judicial resources and minimize[ ] litigation expenses," *Austin v. Pa. Dep't of Corr.*, 876 F.Supp. 1437, 1455 (E.D.Pa.1995). It seems to us of little concern that, under the standard we set forth today, a substantial number of cases may end in settlement rather than adversarial litigation.

*C. The Minnesota business judgment rule*

Finding nothing in either our statutes or case law that compels the level of scrutiny contemplated in *Zapata*, and concluding that the reasoning of *Auerbach* is more persuasive, we adopt a test modeled on the *Auerbach* standard. In accordance with *Auerbach*, 419 N.Y.S.2d 920, 393 N.E.2d at 1001–03, we hold that, under the Minnesota business judgment rule, a court should defer to an SLC's decision to settle a shareholder derivative action if (1) the members of the SLC possessed a disinterested independence and (2) the SLC's investigative procedures and methodologies were adequate, appropriate, and pursued in good faith. We also reaffirm our statement in *Janssen* that if the initial SLC investigation and recommendation fail to satisfy this standard, "the derivative suit proceeds on its merits" with no opportunity to rectify any deficiencies. 662 N.W.2d at 889.

The standard we adopt today is consistent with our observation in *Janssen* that the business judgment rule requires, at a bare minimum, that an SLC be independent and act in good faith. *Id.* at 888 & n. 5. To our knowledge, no jurisdiction has questioned the propriety of these requirements. *See, e.g., Zapata*, 430 A.2d at 788; *Auerbach*, 419 N.Y.S.2d 920, 393 N.E.2d at 1000–01. This standard also finds support in the statute requiring that the members of an SLC be independent, Minn.Stat. § 302A.241, subd. 1, and in the statute precluding director liability for actions taken in good faith, Minn.Stat. § 302A.251, subds. 1 & 4. Finally, the evaluation of the procedures utilized by an SLC is well within the expertise of the judiciary, which frequently considers the adequacy of procedures utilized throughout the trial system, *Auerbach*, 419 N.Y.S.2d 920, 393 N.E.2d at 1002, and the legislative codification of the business judgment liability rule seems to contemplate at least some judicial analysis of the manner in which a decisionmaker gathers the factual data underlying a decision, *see* Minn.Stat. § 302A.251, subd. 2.

The concurrence relies heavily on section 302A.251 in concluding that the business judgment rule contains a rationality requirement. Section 302A.251 sets forth the business judgment liability rule, not the business judgment rule that protects the decision of an SLC from judicial scruti-

ny. Accordingly, although the considerations underlying section 302A.251 inform our understanding of the business judgment rule as it applies to the decision of an SLC to settle a derivative action, the statute itself is not controlling here. The fact that section 302A.251 protects SLC members from personal liability for their decisions does not mean that the statute applies to the actual decision of an SLC to settle a derivative action. We reject the concurrence's presumption that the legislature "unmistakabl[y] inten[ded]" that the same rule apply in both contexts. The statute does not so state, and we decline to expand the scope of the statute as suggested by the concurrence.[9]

*D. Expansion provision*

A court must consider the totality of the circumstances when evaluating an SLC's independence. *See, e.g., Strougo v. Bassini,* 112 F.Supp.2d 355, 362 (S.D.N.Y. 2000); *Johnson v. Hui,* 811 F.Supp. 479, 486 (N.D.Cal.1991); *In re Oracle Corp. Derivative Litig.,* 824 A.2d 917, 941 (Del. Ch.2003). The board resolution creating the UnitedHealth SLC contains the following provision: "FURTHER RESOLVED, that the number of members of the Special Litigation Committee can be expanded in the future through Board action if the Board deems appropriate." Because the parties' briefs did not address the presence of this expansion provision, we ordered supplemental briefing on whether the provision so undermined the UnitedHealth SLC's independence as to render inappropriate any judicial deference to the SLC's business judgment.

Expansion of an SLC at a corporate board's discretion could have the effect of diluting the votes of the original members by the addition of new members who the board feels are more likely to make a favorable decision concerning the derivative litigation. Furthermore, although there is no indication that the expansion power was exercised by the board in this case, the mere retention of that power by a board could influence SLC members to alter their recommendations so as to avoid having their votes rendered meaningless.[10] We conclude that the existence of an expansion provision is one factor in a court's totality-of-the-circumstances evaluation of an SLC's independence. Because we have not been asked to apply the business judgment rule we set forth today, but only to delineate its boundaries, we leave the final analysis of the UnitedHealth SLC's independence to the discretion of the federal district court.[11]

9. We do not share the concurrence's confidence that its rationality test would not devolve, either immediately or over time, into a means of substituting the judgment of a court for the decision of an SLC. In the absence of authority compelling us to adopt such a test, we decline to do so.

10. We recognize that an expansion provision may serve wholly legitimate purposes, such as allowing for the addition of a member to the SLC if one of its original members is disabled or if the size of the investigation necessitates expansion. An expansion provision that limits this power to instances of disability or necessity would raise little or no concerns regarding an SLC's independence, and an expansion provision that limits the power to expand the SLC's membership to disinterested directors would raise fewer concerns than the provision at issue here, which gave the board *absolute* discretion to add members to the SLC. It is worth noting, however, that the effect of an expansion provision such as the one in this case is a question of first impression not only in Minnesota, but also nationwide.

11. Factors that other courts have considered in evaluating an SLC's independence include, but are not limited to, the following: (1) whether the members are defendants in the litigation; (2) whether the members are exposed to direct and substantial liability; (3)

*E. Burden of proof*

Having set forth the elements of the Minnesota business judgment rule, we must also address the burden of proof on these elements. In *Janssen,* we indicated that the burden of proof rests on the corporation, noting that "the board must establish that the committee acted in good faith and was sufficiently independent." 662 N.W.2d at 888. We reaffirm this statement, concluding that the corporation, as well as any other proponent of the SLC recommendation, should bear the burden to show that the elements of our standard have been met.

Basic principles underlying the allocation of burdens of proof provide ample support for this conclusion. First, "all else being equal, the burden is better placed on the party with easier access to relevant information." *Nat'l Commc'ns Ass'n, Inc. v. AT & T Corp.,* 238 F.3d 124, 130 (2d Cir.2001). Clearly, the corporation, which would possess any records concerning the SLC's membership and investigation, is in the best position to provide detailed facts regarding the SLC's good faith and independence. Second, it is the "general rule" that "the party that asserts the affirmative of an issue has the burden of proving the facts essential to its claim." *Auburndale State Bank v. Dairy Farm Leasing Corp.,* 890 F.2d 888, 893 (7th Cir. 1989). Allocation of the burden of proof to the derivative plaintiffs in these circumstances would effectively require them to prove a negative—that the SLC did not act in good faith or was not independent. Thus, "[t]he burden of proving that [the elements have] been met must rest, in all fairness, on the party capable of making that proof—the corporation." *Houle,* 556 N.E.2d at 58.

Under the Minnesota business judgment rule, a court must defer to an SLC's decision to settle a shareholder derivative action if the proponent of that decision demonstrates that (1) the members of the SLC possessed a disinterested independence and (2) the SLC's investigative procedures and methodologies were adequate, appropriate, and pursued in good faith.

Certified question answered.

MAGNUSON, C.J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

MEYER, J., took no part in the consideration or decision of this case.

ANDERSON, PAUL H., Justice (concurring).

I agree with the court's rejection of the rule set forth in *Zapata Corp. v. Maldonado,* 430 A.2d 779 (Del.1981). I also agree that the Minnesota business judgment rule requires the proponent of an SLC recommendation to establish that the SLC was independent, utilized sound investigative procedures, and acted in good faith. But I write separately to voice my concern that, by adopting the rule set forth in *Auerbach v. Bennett,* 47 N.Y.2d 619, 419

whether the "members are outside, non-management directors"; (4) whether the members were on the board when the alleged wrongdoing occurred; (5) whether the "members participated in the alleged wrongdoing"; (6) whether the members approved conduct involving the alleged wrongdoing; (7) whether the members or their affiliated firms "had business dealings with the corporation other than as directors"; (8) whether the members "had business or social relationships with one or more of the defendants"; (9) whether the members received advice from independent counsel or other independent advisors; (10) the severity of the alleged wrongdoing; and (11) the size of the committee. 2 Dennis J. Block et al., *The Business Judgment Rule: Fiduciary Duties of Corporate Directors* 1746–53 (5th ed.1998).

N.Y.S.2d 920, 393 N.E.2d 994 (1979), we have endorsed a rule under which judicial deference might be given to SLC recommendations that are, on their face, wholly irrational. This result is particularly problematic, given that such a rule conflicts with the language of Minn.Stat. § 302A.251 (2006), codifying the business judgment liability rule.

Several courts—our court included—have observed that the business judgment rule does not shelter decisions that are irrational or unreasonable,[1] i.e., wholly without a rational underlying business purpose. *See Janssen v. Best & Flanagan,* 662 N.W.2d 876, 882 (Minn.2003) (" 'The business judgment rule is a presumption protecting conduct by directors that *can be attributed to any rational business purpose.*' ") (quoting Dennis J. Block, et al., *The Business Judgment Rule: Fiduciary Duties of Corporate Directors* 18 (5th ed.1998) (emphasis added)); *id.* (noting that business judgment rule does not protect a director's "abuse of discretion");[2] *Brehm v. Eisner,* 746 A.2d 244, 264 (Del. 2000) ("Irrationality is the outer limit of the business judgment rule." (footnote omitted)); *see also Joy v. North,* 692 F.2d 880, 886 (2d Cir.1982); *Cramer v. Gen. Tel. & Elecs. Corp.,* 582 F.2d 259, 275 (3d Cir. 1978); *Long v. Lampton,* 324 Ark. 511, 922 S.W.2d 692, 699 (1996); *Katz v. Chevron Corp.,* 22 Cal.App.4th 1352, 27 Cal.Rptr.2d 681, 689 (1994); *Willens v. 2720 Wis. Ave. Coop. Ass'n, Inc.,* 844 A.2d 1126, 1137 (D.C.2004). A number of academic commentators have also concluded that objectively irrational decisions should not be sheltered by the business judgment rule. *See, e.g.,* David Millon, *Redefining Corporate Law,* 24 Ind. L.Rev. 223, 253 (1991) ("An obvious example of objectively irrational behavior not entitled to business judgment rule protection would be a decision that, at the expense of the corporation's shareholders, conferred a benefit on some third party not legitimately entitled to management's largesse."); David Rosenberg, *Galactic Stupidity and the Business Judgment Rule,* 32 J. Corp. L. 301, 322 (2007) ("Courts will not often impose liability for the galactic stupidity of directors, but the possibility must at least exist, or the duty of good faith dissolves completely. . . .").

As one court has explained, review for irrationality is another means by which a court may ensure that the decision under scrutiny was made in good faith. *See Brehm,* 746 A.2d at 264 ("Irrationality . . . may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule.").[3]

1. I utilize the synonymous terms "irrational" and "unreasonable" interchangeably, with no particular significance ascribed to the use of one term over the other.

2. The term "abuse of discretion" is generally used in this context to describe " 'a decision that is so removed from the realm of reason or so unreasonable as to fall outside the permissible realm of sound discretion.' " Block, et al., *supra,* at 85 (quoting *Proposed Model Bus. Corp. Act. § 8.30 Official Comment,* 53 Bus. Law. 157, 164 (1997)).

3. Any analysis of a decisionmaker's good faith, by its very nature, will necessitate scrutiny of the decision's rationality. *Cf.* S. Samuel Arsht, *The Business Judgment Rule Revisited,* 8 Hofstra L.Rev. 93, 122 (1979) ("This [rationality] limitation to the business judgment rule is, perhaps, not a limitation at all, but simply an application of the fundamental principle behind the rule."). Because a decisionmaker's good faith is a state of mind, *see* Minn.Stat. § 302A.011, subd. 13 (2006) (defining good faith as "honesty in fact in the conduct of the act or transaction concerned"), of which direct evidence will typically be lacking, good faith will usually have to be ascertained by means of indirect evidence. Evidence particularly indicative of a decisionmaker's state of mind would be the relationship (or lack thereof) of the decision

Most importantly, two courts that have considered this matter have determined that the business judgment rule does not mandate judicial deference to objectively unreasonable SLC recommendations. *See Houle v. Low,* 407 Mass. 810, 556 N.E.2d 51, 59 (1990) ("The judge must determine, on the basis of the evidence presented, whether the committee reached a reasonable and principled decision."); *House v. Estate of Edmondson,* 245 S.W.3d 372, 382 (Tenn.2008) (stating that courts must take into consideration "the soundness of the committee's conclusions and recommendations").

This rationality requirement is reflected in the language of Minn.Stat. § 302A.251, which, as the majority concedes, "inform[s] our understanding of the business judgment rule as it applies to the decision of an SLC to settle a derivative action." *Ante.* Under section 302A.251, a director may take advantage of the business judgment rule *only* if he or she has acted "in good faith, in a manner [he or she] reasonably believes to be in the best interests of the corporation, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances." Minn.Stat. § 302A.251, subd. 1. Notably, section 302A.251 expands significantly upon the language of its predecessor, which required only that directors act "in good faith, and with that diligence and care which ordinarily prudent men would exercise under similar circumstances in like positions." Minn.Stat. § 301.31 (1980); *see also* Minn.Stat. Ann. § 302A.251, Reporter's Note—1981 at 353 (West 2004) (Reporter to the Minnesota Task Force on Corporate Law) (stating that the business judgment rule "is made a three-part rule by [section 302A.251's] addition of the words 'in a manner the director reasonably believes to be in the best interests of the corporation' ").[4]

One could argue that section 302A.251 contains no rationality requirement, but only provides additional language to clarify the meaning of "good faith." Under such an interpretation, section 302A.251 would set forth a requirement of good faith, only to restate that requirement in alternative language before setting forth an additional requirement of due care. But the legislature has defined "good faith" as "honesty in fact in the conduct of the act or transaction concerned." Minn.Stat. § 302A.011, subd. 13 (2006). Thus, the statute's good faith requirement is entirely unlike its reasonableness requirement; the former sets forth the particular state of mind required of a corporate director, while the latter mandates that any decision be reasonable. Further, if "good faith" and "reasonably believes" were to mean essentially the same thing, a substantial part of section 302A.251 would be superfluous. To interpret those words synonymously would in essence treat the statute as only requiring that the director *believe* his actions to be in the best interests of the corporation, rather than "reasonably believe[ ]" them to be so. Such an interpretation conflicts with our canons of statutory construction, under which "a statute is to be construed as a whole so as to harmonize and give effect to all its parts, and where possible, no word, phrase, or sentence will be held superfluous, void, or insignificant." *Anderson v. Comm'r of Taxation,* 253 Minn. 528, 533, 93 N.W.2d 523, 528 (1958); *see also* Minn. Stat. § 645.16 (2006) ("Every law shall be

to the facts on which the decisionmaker purports to base the decision.

4. The relevant language of section 302A.251 appears to have largely escaped the attention of the parties who submitted briefs on this matter, and was not addressed in our opinion in *Janssen.*

construed, if possible, to give effect to all its provisions.").

The language of section 302A.251 is particularly relevant to our analysis of the federal district court's certified question, given that the legislature has specifically made this section applicable to SLC members. *See* Minn.Stat. § 302A.241, subd. 7 (2006) (deeming committee members "directors for purposes of section[ ] 302A.251"); *cf. Alford v. Shaw,* 320 N.C. 465, 358 S.E.2d 323, 327–28 (1987) (relying on a statute concerning director conflicts as an "expression of legislative intent" regarding North Carolina business judgment rule). The Minnesota legislature considered it significant that SLC members' actions be reasonable in light of the corporation's best interests. In fact, the legislature considered reasonableness to be of such significance that it made it *impossible* for an SLC member to seek shelter under the business judgment liability rule if he could not have reasonably thought his actions to be in the corporation's best interests.

Naturally, then, one would expect the Minnesota business judgment rule to require that a similar showing of reasonableness be made before any deference will be accorded to the recommendation of a properly-constituted SLC. After all, *Auerbach* itself is premised on the very notion that corporate litigation decisions should be treated no differently than any other decisions normally shielded by the business judgment rule. *See Auerbach,* 419 N.Y.S.2d 920, 393 N.E.2d at 1000–01 (noting similarity between litigation decisions and other "questions of corporate policy and management"). Yet, without explanation, the majority requires a *lesser* showing on the part of an SLC seeking judicial deference to a decision not to pursue derivative litigation than would be required of a corporate director defending, or seeking deference to, *the exact same decision.* The majority does so despite the legislature's unmistakable intent that, generally, the business judgments of directors and SLC members receive identical treatment from the courts. *See* Minn.Stat. § 302A.241, subd. 7.[5] While I agree that concerns about an SLC's structural bias are inadequate to justify an expansion of the business judgment rule, those concerns are more than sufficient to counsel against the majority's excision of an entire element from the business judgment rule.

Based upon the language of section 302A.251, I conclude that the Minnesota business judgment rule requires a greater level of scrutiny than is contemplated in *Auerbach,* though not the limitless review permitted in *Zapata.* Rather, it appears that section 302A.251 calls for a middle ground between these competing standards—a middle ground under which a court, after evaluating an SLC's independence, investigative methods, and good

5. My conclusion is not, as the majority would imply, premised on a mistaken belief that section 302A.251 is "controlling." *Ante.* Rather, it is based upon the simple fact that the application of two radically different business judgment rules—one in the context of liability assessments, the other in the context of SLC recommendations—creates a unnecessary inconsistency in Minnesota law. In fact, the failure to apply a reasonableness requirement to an SLC's recommendations may lead to unfortunate results. Under the rule articulated by the majority, an unreasonable SLC recommendation may receive deference under the business judgment rule, while still exposing the members of the SLC to personal liability under section 302A.251, which explicitly requires a showing of reasonableness. It is unlikely that the legislature intended such contradictory results to stem from the application of its statutory scheme. *Cf.* Minn. Stat. § 645.16(6) (stating that, when interpreting a statute, the courts are to take into account "the consequences of a particular interpretation").

faith, must determine whether the SLC's recommendation can be attributed to any rational business purpose. By allowing such limited scrutiny of the reasonableness of an SLC recommendation, we will avoid an unnecessary (and inexplicable) divergence between the business judgment rule applied to an SLC recommendation and the business judgment liability rule codified in section 302A.251. More importantly, we will address the concerns that likely motivated the court in *Zapata,* without encroaching upon the rightful authority of directors to manage corporate affairs. *See* John. D. Donovan, Jr., *Derivative Litigation and the Business Judgment Rule in Massachusetts: Houle v. Low,* 34 Boston Bar.J. 22, 26 (1990) (noting that the reasonableness review adopted in *Houle* may cause courts to "more appropriately balance the interests of necessary scrutiny against the avoidance of second-guessing"). Under the standard I propose, facially unreasonable recommendations—likely a central concern of the *Zapata* court—will receive no judicial deference. At the same time, an SLC will retain the ability to choose from a wide variety of recommendations in any given set of circumstances—the recommendation need only be reasonable, and a court would have no authority to insist upon one reasonable recommendation over another.[6]

Of course, if the rationality of an SLC's recommendation is to be adequately evaluated, a court must take into account what support the SLC's report provides for that recommendation. Without some indication or explanation of what the SLC relied upon in reaching its recommendation, it would be impossible for a court to determine the rationality of that recommendation. As a result, any evaluation of the rationality of an SLC recommendation must take into account the grounds the SLC provides in support of its recommendation.

Lastly, it appears necessary to point out that, unlike review under the second step of *Zapata,* it would be relatively rare for rationality review to result in the rejection of an SLC's recommendation, given the unlikelihood of an irrational result stemming from a methodologically sound investigation conducted independently and in good faith. A court applying this element of the business judgment rule has no leeway, as it would under *Zapata,* to interfere merely on the basis of a disagreement with the SLC on matters of business judgment.[7] If the SLC's recommendation is reasonably in the best interests of the corporation, the court may not decline to grant deference to that recommendation unless another element of the business judgment rule has not been met.[8] As a result, this rationality requirement will affect only

6. *See* Arsht, *supra,* at 122 ("An honest error in judgment is allowed. But a judgment that cannot be sustained on some rational basis falls outside the protection of the business judgment rule; the transaction's results may often belie the honest, good faith exercise of judgment.").

7. *See* Arsht, *supra,* at 126 ("In conducting its own analysis of the reasonableness of the directors' business judgment, the court does not attempt to decide whether it agrees with the directors' judgment. The court determines only whether there is a reasonable basis for the directors' decision."). Put another way, a court may only decline to give deference to a decision "so blatantly imprudent that it is inexplicable, in the sense that no well-motivated and minimally informed person could have made it." William T. Allen, et al., *Realigning the Standard of Review of Director Due Care With Delaware Public Policy: A Critique of* Van Gorkom *and its Progeny as a Standard of Review Problem,* 96 Nw. U.L.Rev. 449, 452 (2002) (footnote omitted).

8. The majority appears to be concerned that any analysis of the reasonableness of an SLC recommendation will pose the same dangers as the *Zapata* approach. Such concern may be based upon the mistaken belief that a court conducting rationality review has broad dis-

those cases in which the other elements of the business judgment rule somehow fail to catch a manipulation of the SLC process. In most cases, rationality review will simply affirm the results of a court's analysis of the SLC's independence, investigative procedures, and good faith. Just the same, I conclude that it would be improvident to excise this element of the business judgment rule, which goes far to address *Zapata's* structural bias concerns without intruding on the wide discretion to be afforded to an SLC.

Because I believe that the Minnesota business judgment rule requires a court to consider the reasonableness of an SLC's recommendation as well as the SLC's independence, investigative methods, and good faith, and I only concur in the court's resolution of the certified question.

cretion to substitute its own judgment for that of an SLC. As I make clear, however, rationality review is limited in scope. *See supra* note 7 and accompanying text. Properly understood, rationality review would not implicate the majority's key concerns—rationality review would not require the application of unclear standards on review, would not intrude on the directors' rights to manage the corporation, gives no leeway for a court to impose its biases upon the SLC, does not take into account such nebulous concerns as "matters of ... public policy," and creates little uncertainty as to which SLC recommendations will receive deference from the courts. Moreover, for a court to recognize the utter irrationality of an SLC recommendation, only to defer to that decision anyway, would itself " 'inevitably fuel[ ][the] disrespect for the courts' " about which the majority is rightfully concerned. *Ante* (quoting Franklin A. Gevurtz, *Who Represents the Corporation? In Search of A Better Method for Determining the Corporate Interest in Derivative Suits,* 46 U. Pitt. L.Rev. 265, 305 (1985)).