Kathryn Ward BLUM,
et al., Appellants,

and

Thomas Ward, Co-Appellant,

v.

Molly THOMPSON, et
al., Respondents,

Richard Ward, Respondent,

Kevin Ward, Respondent,

Ward Family, Inc., Respondent.

A16-1241

Court of Appeals of Minnesota.

Filed August 14, 2017

Review Denied Oct. 25, 2017

John F. Mathews, Kelly A. Larson, Hughes Mathews Greer, P.A., St. Cloud, Minnesota (for appellants Kathryn Ward Blum and Charles Ward).

Mark V. Steffenson, Henningson & Snoxell, Ltd., Maple Grove, Minnesota (for co-appellant Thomas Ward).

Paul A. Rajkowski, Matthew W. Moehrle, Christopher A. Wills, Rajkowski Hansmeier Ltd., St. Cloud, Minnesota (for respondents Molly Thompson and Ann Sullivan).

Robert H. Wenner, Reichert Wenner, P.A., St. Cloud, Minnesota (for respondent Richard Ward).

Boe M. Piras, Willenbring, Dahl, Wocken & Zimmerman, PLLC, Cold Spring, Minnesota (for respondent Kevin Ward).

Thomas A. Janson, Janson Law Office, Waite Park, Minnesota (for respondent Ward Family Inc.).

Considered and decided by Larkin, Presiding Judge; Johnson, Judge; and Reilly, Judge.

## OPINION

JOHNSON, Judge

Three minority shareholders of a family-owned corporation, Ward Family Inc., brought this lawsuit after the corporation leased its sole asset, 1,200 acres of real property, to a corporation owned by another family member, on terms that the plaintiff shareholders believe are unfavorable to them and to Ward Family Inc. The district court entered summary judgment in favor of the defendants on the plaintiffs' claims of breach of fiduciary duty and oppression of minority shareholders' rights. We conclude that the district court erred in those rulings. But we also conclude that the district court did not err by entering summary judgment in favor of the defendants on the plaintiffs' derivative claims. Therefore, we affirm in part, reverse in part, and remand for further proceedings.

## FACTS

Richard Ward and Rosemary Koop Ward were married in 1958. During their marriage, they had seven children: Kathryn Ward Blum, Charles Ward, Kevin Ward, Thomas Ward, Molly Thompson, Ann Sullivan, and Maggie Motyl.

### History of Corporate Asset

In the 1960s, Richard and Rosemary acquired 1,200 acres of rural property in Stearns County from Rosemary's parents. In the 1960s or 1970s, Richard and Rosemary also purchased El Rancho Manana Inc. (ERMI) from Rosemary's parents. Through ERMI, Richard and Rosemary operated a commercial campground and a horse stable on approximately 200 acres of the 1,200-acre property for approximately two decades. Richard and Rosemary's children worked for the campground during their childhood years, and some children continued to do so in adulthood. Family members generally refer to both the property and the associated business as "the ranch." Family members also have used the property for both recreational and revenue-producing activities, including farming, cross-country skiing, snowmobiling, deer hunting, footraces, concerts, rodeos, cattle grazing, logging, and treasure hunts.

Richard and Rosemary were divorced in 1985. They stipulated to a dissolution decree that awarded all of the 1,200-acre property and all shares of ERMI to Richard. But the dissolution decree contained numerous restrictions on Richard's interests in the real property and ERMI. The relevant provisions of the dissolution decree are as follows:

3. That [Richard] shall assume ownership and title to certain real estate, commonly referred to as El Rancho Manana Campgrounds and Riding Stable which is legally described as follows:

. . . .

b. Should [Richard] remarry, he shall execute a valid premarital agreement pursuant to Minnesota Statutes to be signed by both himself and his new spouse. Said premarital agreement will confirm that the above-described real estate will always be a part of [Richard]'s Estate, singly and separately, and

[Richard]'s new spouse and/or issue of that marriage will not acquire any right, title or interest in the [land] by virtue of the marriage or in any other way.

c. [Richard] within ninety (90) days of the entry of the judgment and decree in this matter [shall] execute a will which shall devise the above referenced real estate in the following proportions:

(1) An undivided 3/10 interest to Rosemary Ward, if living and an undivided 7/10 interest or all thereof if Rosemary Ward is not then living, to the then living children of this marriage or the living issue of any predeceased child by right of representation.

(2) The above referenced provisions of [Richard]'s will shall remain in effect at his death, and shall not be subject to change by [Richard].

(3) In the event [Richard] fails to have a will with the above referenced provision in full force and effect at the time of his death, [Rosemary] and the children of this marriage or the living issue of any predeceased child by right of representation shall have a claim against [Richard]'s estate in an amount equal to the value of their respective interests as stated above.

d. [Richard] shall prior to selling said property give to [Rosemary] and each of the children of this marriage the option to purchase said real estate at or below the same price and upon the same terms as offered by a bona fide purchaser.

e. [Richard] may encumber [the land] to secure a loan or any other indebtedness only if said loan or indebtedness is used to improve [the land] or the business presently being conducted thereon.

f. [Richard] and the parties' children shall have sole discretion as to whether [the land] should be sold in the future. Any sale shall be for not less than the [land]'s fair market value. In the event said real estate is sold the proceeds, after payment of all mortgages, liens, taxes, and reimbursement to [Richard] for costs incurred by him for any capital improvement made to the real estate from the date of transfer to the time of sale, which has been paid for by him, shall be divided as follows: Thirty-five percent (35%) of said net proceeds paid to [Richard], Thirty percent (30%) paid to [Rosemary], and Thirty-five percent (35%) to the parties' seven natural children or the living issue of any predeceased child by right of representation. In the event that [Rosemary] is deceased at the time of sale, her respective share of the net proceeds shall be divided equally between [Richard] and the children of this marriage or the living issue of any predeceased child by right of representation.

4. [Rosemary] shall execute any and all documents necessary to transfer her shares of stock in the Minnesota Corporation El Rancho Manana, Incorporated to [Richard].

a. [Richard] shall draft an agreement relating to the operation of [ERMI] and its business providing that [Richard] and the seven natural children of the parties shall have direct, decision making authority relating to the conduct of the business, expansion and/or improvements.

After the divorce, Richard continued to operate the campground on the property that he was awarded in the dissolution decree.

### Formation of WFI

On December 7, 1998, Richard formed Ward Family Inc. (WFI). His stated purpose in doing so was to allow him to give the 1,200-acre property to his seven children incrementally, with minimal gift taxes

and estate taxes. Three days after forming the corporation, Richard transferred his interest in the 1,200-acre property to WFI by a quit-claim deed. At the same time, WFI's counsel asked Rosemary to transfer any interest she may have in the 1,200-acre property to WFI by a quit-claim deed. In a letter dated December 10, 1998, corporate counsel explained to Rosemary the reasons for the request:

First, the purpose of all of this is to have the ranch real estate transferred to the seven children. In your divorce decree there are provisions requiring the property to be left to the children in the event of Dick's death, or the granting of a claim against his estate if it is sold. By transferring the real estate to the corporation, Dick will be able to gift the shares to the children over a period of a few years and retain some or all of his credit against estate and gift tax....

Second, by transferring the real estate to the corporation, the title should be cleared of the claims in the divorce decree so the children will be able to eventually work with the property without any title problems.

Third, the Stock Redemption and Alternate Purchase Agreement goes a few steps beyond protecting the shares of stock. In order to continue the desire you have to keep the title to the real estate in the children I have specifically provided that the real estate, once in the corporation, may not be sold without the agreement of all of the shareholders until sufficient shares have been transferred to the children to give them, collectively, control of the corporation. After that I stated that the real estate could only be sold upon agreement of seventy-five percent of the outstanding shares. I did this so if the children should decide that the land, or part of it, is to be sold, the sale would not be prevented by any one or two stockhold-

ers.... Also, I included provisions that were requested in terms of keeping the real estate in the blood line....

Drafts of a quit-claim deed and a redemption-and-purchase agreement were enclosed with the letter. On December 16, 1998, Rosemary executed a quit-claim deed in favor of WFI.

On December 17, 1998, Richard gave approximately two percent of the outstanding shares of WFI to each of his seven children. On December 25, 1998, WFI's counsel met with the seven children. After some discussion, each of them executed a quit-claim deed in favor of WFI. The proposed redemption-and-purchase agreement never was executed. Richard gave additional shares to each child in equal amounts in 1999 and 2000.

**ERMI's Use of WFI's Property**

When Richard owned both the 1,200-acre property and ERMI, there was no formal, written lease agreement. After the formation of WFI, ERMI continued to operate its business on approximately 200 acres of the 1,200-acre property without a written lease agreement. ERMI made rent payments to WFI in amounts equal to WFI's property taxes, fees for professional services, insurance premium expenses, and payments on a loan that was secured by a lien on the property. Thus, WFI's rental income was approximately the same as its expenses, which meant that WFI did not generate net income.

From the 1970s until the 1990s, Charles managed ERMI's campground operations. Richard later hired Kevin to manage the campground, and Charles eventually withdrew from the business. After he hired Kevin, Richard informed other family members that he intended to sell ERMI to Kevin. But Richard said that he would not sell ERMI or relinquish his majority inter-

est in WFI unless there was a formal lease agreement between the two companies.

After the formation of WFI and Richard's initial gifts of shares to his seven children, the eight shareholders held meetings from time to time. There is evidence in the record that, even though Richard owned a majority of WFI's shares, all shareholders discussed and voted on various matters, including proposed improvements to the 1,200-acre property, potential alternative uses of the property, ERMI's business, the terms of a possible written lease between WFI and ERMI, and the ownership of the campground. Kathryn and Charles testified in their respective depositions that WFI had a custom of consensus decision-making and that decisions were guided by the goal of maintaining equal ownership rights. Kathryn testified that the seven children had discussed a plan by which WFI would be governed by a board composed of all seven children and that a supermajority of five- or six-sevenths would be required for certain decisions. The minutes of an August 13, 2000 meeting reflect that the eight shareholders discussed a proposed amendment to the bylaws concerning corporate governance that might be adopted after Richard had given away all of his shares.

Between 2000 and 2006, ERMI made several improvements to the campground facilities, including the expansion of a performance stage and the expansion of water, sewer, and electrical services to campground sites. Richard lent ERMI more than $250,000 to allow ERMI to pay for the improvements. In January 2007, WFI purchased the improvements from ERMI. To make WFI's purchase possible, Richard and Molly caused WFI to borrow $249,000 from a bank. The loan was secured by a mortgage, which Richard executed, on 360 acres of the 1,200-acre property. Richard and Molly did not immediately disclose to other shareholders that Richard had executed the mortgage. WFI's other shareholders learned of the mortgage several months later from another source. At the time, each of the seven children owned approximately five and one-half percent of WFI's shares.

In 2010, 2011, and 2012, Richard gave additional shares of WFI to each child in equal amounts. In January 2012, Rosemary acquired approximately one-half of one percent of the outstanding shares from Charles.

**Election of WFI's Board of Directors**

In early November 2012, Richard told Molly that he intended to give away his remaining shares and to cease being WFI's sole director and sole officer. At the time, Richard owned 50.2% of WFI's outstanding shares, and each of the seven children owned approximately seven percent.

At a November 14, 2012 meeting, Richard moved to elect three directors. Charles moved to amend Richard's motion to provide for a seven-person board of directors instead of a three-person board. Charles's motion to amend failed on a vote of 21% to 79%, with Richard, Molly, Kevin, Ann, and Maggie voting nay. Richard's motion passed. Holders of a majority of shares elected Richard, Ann, and Molly as directors. The board of directors appointed Ann as president and CEO and Molly as secretary, treasurer, and CFO.

**Lease Between WFI and ERMI and Sale of ERMI**

After the election of WFI's board and the appointment of officers, WFI and ERMI negotiated a lease. Ann and Molly negotiated on behalf of WFI; Kevin negotiated on behalf of ERMI, even though Richard was ERMI's sole officer and director. Rosemary, Kathryn, and Charles suggested lease terms to the WFI board,

including provisions that would limit the leased premises to the portions of the 1,200-acre property that actually were used by ERMI's business, limit the term of the lease to three years or less, require ERMI to pay rent at market rates, and allow WFI shareholders to use campground sites without charge.

On December 27, 2012, WFI and ERMI entered into a written lease agreement. Ann and Molly signed on behalf of WFI; Richard signed on behalf of ERMI. The written lease agreement allows ERMI to use the entire 1,200-acre property for a 20-year term, with the right to renew for another 20-year term and the right to then become a year-to-year tenant. ERMI is required by the lease to pay rent in an amount sufficient to cover WFI's administrative and professional fees, real estate taxes and assessments, mortgage payments, and debt payments on "any future obligations for improvements requested by" ERMI. The lease states that ERMI has exclusive use of the portions of the 1,200-acre property used by its business, without any reservation of rights benefitting WFI shareholders, and that ERMI has discretion to exclude WFI shareholders from other portions of the 1,200-acre property. The lease states that ERMI may encumber the leased premises with a mortgage to finance improvements, unless the holders of five-sevenths of WFI's outstanding shares disapprove.

On December 31, 2012, four days after the lease agreement was executed, Richard gave the remainder of his WFI shares to his seven children, except for one share, which he retained. Kathryn testified in a deposition that she did not learn of the lease agreement until four months later. She also testified that Kevin made statements at a January 2013 meeting that led her to believe that a lease agreement had not been signed.

In March 2013, three months after the lease agreement was executed, Kevin purchased ERMI from Richard's wife, to whom Richard previously had transferred all of ERMI's shares. The financial terms of Kevin's acquisition of ERMI are not in the district court record. Charles testified to his belief that, before the transaction, Richard owed Kevin a debt of more than $100,000 and that his debt may have been reduced or eliminated by the sale of ERMI.

Charles testified that, since the execution of the lease agreement, he has not been allowed to use the campground without entering into a written rental agreement, in the same manner as members of the public. He testified that Kevin has restricted access to portions of the 1,200-acre property that ERMI does not use, thereby preventing him and Thomas from engaging in the types of recreational activities that they previously enjoyed. Specifically, Charles testified that Kevin has placed locks on gates to the property, that Kevin's attorney sent him a cease-and-desist letter, and that Kevin has called the police when Charles has entered the property.

## Opposition to Actions of WFI's Directors and Officers

In May 2013, Rosemary filed a motion in the dissolution case to hold Richard in contempt of court for not complying with the 1985 dissolution decree. Rosemary asked the district court to, among other things, "strike the business transactions that have occurred since January 9, 1985 and grant control of the business entities to" her. The district court denied Rosemary's motion on the ground that the dissolution decree had expired without having been renewed. *Ward v. Ward*, No. 73-F5-84-2436, at 2-3 (Stearns Cnty., Minn., Dist. Ct. July 10, 2013) (order). Rosemary filed a notice of appeal, but this court dismissed

it as untimely. *Ward v. Ward*, No. A13-1697, at 3 (Minn. App. Oct. 8, 2013) (order).

At a June 17, 2013 meeting of shareholders, Charles moved to remove Richard, Molly, and Ann as directors. The motion failed by a vote of 43% to 57%, with Richard, Molly, Kevin, Ann, and Maggie voting nay.

**Procedural History of This Action**

In February 2014, Kathryn, Charles, and Thomas commenced this action against Molly, Ann, Richard, Kevin, and WFI. The complaint alleges eight causes of action. In the first three counts, the plaintiffs allege direct claims against the individual defendants: (1) breach of fiduciary duty; (2) oppression of minority shareholders' rights, in violation of Minn. Stat. § 302A.751, subd. 1(b)(2), (3), and (5) (2016); and (3) a request for the costs of litigation, pursuant to Minn. Stat. § 302A.467 (2016). In the next four counts, the plaintiffs allege derivative claims on behalf of WFI against the individual defendants: (4) breach of fiduciary duty; (5) corporate waste; (6) unjust enrichment; and (7) a request for the costs of litigation. In the eighth count, the plaintiffs seek an accounting of WFI.

In March and April 2014, the individual defendants, through separate counsel, filed three motions to dismiss counts 1 through 7 or, in the alternative, for summary judgment. The district court treated the motions as seeking summary judgment. In August 2014, the district court granted the motions with respect to count 1.

In November 2014, WFI's board established a special litigation committee (SLC) "to investigate, evaluate and make a binding determination as to whether it is in [WFI]'s best interest to pursue, settle, dismiss or otherwise dispose of the derivative claims presented in the lawsuit." During the SLC's investigation, WFI (through the SLC) entered into an agreement with Kevin that "resolve[d] ... allegations against [him] in lieu of commencement of a lawsuit." As part of the settlement, WFI renegotiated the lease with ERMI to address some of the plaintiffs' concerns. The result was an addendum to the lease, which, among other things, prevents ERMI from encumbering WFI's real property without WFI's approval and prevents ERMI from unreasonably limiting or restricting WFI shareholders' access to WFI's property. In April 2015, the SLC issued a 21-page report, in which it concluded that the individual defendants did not breach their fiduciary duties to WFI, did not engage in corporate waste, and did not act fraudulently or illegally. The SLC recommended that WFI not pursue any of the plaintiffs' derivative claims against the individual defendants. In July 2015, the individual defendants moved for summary judgment on counts 4 through 7. In December 2015, the district court granted their motions.

In March 2016, the individual defendants moved for summary judgment on various counts, including count 2, the claim of oppression of minority shareholders' rights under section 301A.751. In June 2016, the district court granted their motions with respect to count 2.

In July 2016, the district court granted plaintiffs' motion to amend the complaint to make WFI a defendant, ordered judgment on count 3, and ordered a final partial judgment with respect to counts 1 through 7. *See* Minn. R. Civ. P. 54.02. Kathryn and Charles filed a notice of appeal. They challenge the district court's summary-judgment rulings with respect to the direct claims in counts 1, 2, and 3. Thomas filed a notice of related appeal through separate counsel. He joins Kathryn and Charles in challenging the district court's summary-judgment rulings on

counts 1 and 2, and he also challenges the district court's summary-judgment ruling on the derivative claims in counts 4 through 7. This court has designated Thomas a co-appellant.

## ISSUES

I. Did the district court err by granting summary judgment to respondents on appellants' claim of breach of fiduciary duty?

II. Did the district court err by granting summary judgment to respondents on appellants' claim of oppression of minority shareholders' rights under Minnesota Statutes section 302A.751, subdivision 1(b)(3)?

III. Did the district court err by granting summary judgment to respondents on appellants' derivative claims?

## ANALYSIS

■ Appellants argue that the district court erred by granting respondents' motions for summary judgment. A district court must grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. A genuine issue of material fact exists if a rational trier of fact, considering the record as a whole, could find for the non-moving party. *Frieler v. Carlson Mktg. Grp.*, 751 N.W.2d 558, 564 (Minn. 2008). "[T]here is no genuine issue of material fact for trial when the nonmoving party presents evidence which merely creates a metaphysical doubt as to a factual issue and which is not sufficiently probative with respect to an essential element of the nonmoving party's case to permit reasonable persons to draw different conclusions." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997). We apply a *de novo* standard of review to the district court's decision to grant summary judgment, viewing the evidence in the light most favorable to the non-moving party. *Osborne v. Twin Town Bowl, Inc.*, 749 N.W.2d 367, 371 (Minn. 2008).

### I.

Appellants argue that the district court erred by granting summary judgment to respondents on count 1, a common-law claim of breach of fiduciary duty.

■ In a corporation in which shareholders participate in management in a manner similar to partners, each shareholder has a fiduciary duty to other shareholders. *Advanced Commc'n Design, Inc. v. Follett*, 615 N.W.2d 285, 293-94 (Minn. 2000). Shareholders of a closely held corporation have a fiduciary duty to observe "the highest standard of integrity in their dealings with each other." *Evans v. Blesi*, 345 N.W.2d 775, 779 (Minn. App. 1984), *review denied* (Minn. June 12, 1984). That fiduciary duty includes the duty to deal "openly, honestly and fairly with other shareholders," *id.*, and to "act with complete candor in their negotiations with each other," *Gunderson v. Alliance of Computer Prof'ls, Inc.*, 628 N.W.2d 173, 186 (Minn. App. 2001), *review granted* (Minn. July 24, 2001), *appeal dismissed* (Minn. Aug. 17, 2001). The common-law fiduciary duty "embraces both substantive obligations that focus on the outcomes of shareholder conduct and procedural obligations that focus on process." *Id.* at 185 (citing Daniel S. Kleinberger, *Why Not Good Faith? The Foibles of Fairness in the Law of Close Corporations*, 16 Wm. Mitchell L. Rev. 1143, 1156 (1990)).

### A.

■ In their motions, respondents sought dismissal or summary judgment on

counts 1 through 3 on the ground that those claims are properly characterized as derivative claims on behalf of the corporation, not direct claims on behalf of the shareholders. As a general rule, "an individual shareholder may not assert a cause of action that belongs to the corporation." *Northwest Racquet Swim & Health Clubs, Inc. v. Deloitte & Touche,* 535 N.W.2d 612, 617 (Minn. 1995). A shareholder may, however, pursue a cause of action on behalf of the corporation if the corporation has failed to do so. *Janssen v. Best & Flanagan,* 662 N.W.2d 876, 882 (Minn. 2003). "A shareholder derivative suit is a creation of equity in which a shareholder may, in effect, step into the corporation's shoes and seek in its right the restitution he could not demand in his own." *In re United-Health Group Inc. S'holder Derivative Litig.,* 754 N.W.2d 544, 550 (Minn. 2008) (quotation omitted).

 To determine whether a claim is direct or derivative, a court must determine "whether the complained-of injury was an injury to the shareholder directly, or to the corporation." *Wessin v. Archives Corp.,* 592 N.W.2d 460, 464 (Minn. 1999). A court must "look not to the theory in which the claim is couched, but instead to the injury itself." *Id.* If a shareholder has indirectly sustained an injury that directly affects the corporation, the shareholder may assert only a derivative claim. *Id.* This court applies a *de novo* standard of review to the question whether a claim is direct or derivative. *Id.*; *Blohm v. Kelly,* 765 N.W.2d 147, 153 (Minn. App. 2009).

Even though the district court treated respondents' motions as summary-judgment motions, the district court relied solely on the complaint for purposes of its direct-derivative analysis. The district court observed that the complaint alleged four actions by respondents with four corresponding injuries: (1) respondents' alleged exclusion of appellants from the decision-making process of the family business, (2) Richard's execution of a mortgage encumbering WFI's sole asset, (3) the negotiation and execution of the written lease agreement between WFI and ERMI, and (4) the sale of ERMI to Kevin. Appellants do not challenge the manner in which the district court identified the alleged actions and injuries and framed the issues. The district court concluded that the second, third, and fourth alleged injuries affected only the corporation such that appellants' claims based on those actions are properly characterized as derivative claims. On appeal, appellants contend that the district court erred because the second, third, and fourth alleged injuries should have been characterized as direct claims.

 With respect to the second alleged injury, the district court properly characterized it as a derivative injury to the corporation because the mortgage on WFI's real property affected the corporation directly and affected shareholders only indirectly in the same manner. Appellants' claim is similar to a claim made in *Skoglund v. Brady,* 541 N.W.2d 17 (Minn. App. 1995), *review denied* (Minn. Feb. 27, 1996), in which a plaintiff challenged a corporation's decision to issue promissory notes to two other shareholders. *Id.* at 19. On appeal, this court concluded that the plaintiff's claim was a derivative claim because the plaintiff did "not allege an injury to himself that is separate and distinct from any injury to the corporation." *Id.* at 22. For essentially the same reason, appellants did not sustain a direct injury, independent of the alleged injury to WFI, as a result of Richard's execution of the mortgage on WFI's real property.

 With respect to the third alleged injury, the district court properly characterized it as derivative insofar as the written lease agreement with ERMI is alleged

to be disadvantageous to WFI. Appellants' claim again is similar to a claim made in *Skoglund*, in which the plaintiff challenged leases that had been authorized by the corporation's board, which this court deemed to be a derivative claim. *Id.* at 19. But the third alleged injury also directly affects certain shareholders in their individual capacities insofar as the written lease agreement is alleged to deprive individual shareholders of property rights or interests that they enjoyed before the written lease agreement was executed, such as the right to use the 1,200-acre property for camping, hunting, and other recreational activities.

▮ With respect to the fourth alleged injury, the district court improperly characterized it as derivative. Appellants' allegations concerning the sale of ERMI do not imply that WFI was injured in any way. Any injury arising from that transaction would necessarily be a direct injury to appellants' individual interests.

Thus, appellants have alleged direct claims in count 1 and in count 2 to the extent that the claims are based on the first, third, and fourth alleged injuries.

### B.

After resolving the direct-derivative issues presented by the parties, the district court considered whether appellants would be entitled to a remedy if they were to establish liability on count 1, their common-law claim of breach of fiduciary duty. In doing so, the district court considered three issues: whether appellants requested monetary damages or equitable relief in count 1; whether the caselaw permits an award of monetary damages on a claim of breach of fiduciary duty; and whether appellants presented sufficient evidence of financial losses to justify an award of monetary damages on count 1. None of these issues was presented to the district court

in the parties' respective memoranda of law in support of or in opposition to respondents' motions. The district court apparently considered the issues *sua sponte*.

▮ The district court ruled that monetary damages are not available to appellants on their claim of breach of fiduciary duty. Appellants contend that the district court misinterpreted the law. Appellants are correct. The availability of monetary damages on such a claim is implicit in our opinion in *Pedro v. Pedro*, 463 N.W.2d 285 (Minn. App. 1990) *(Pedro I)*, *review denied* (Minn. Jan. 24, 1991), a case involving the rights of minority shareholders. *Id.* at 288-89. We stated, "Whether damages may be awarded for breach of fiduciary duty must ... be determined by" an inquiry into whether the plaintiff sustained a financial injury. *Id.* at 288. Later, in *Pedro v. Pedro*, 489 N.W.2d 798 (Minn. App. 1992) *(Pedro II)*, *review denied* (Minn. Oct. 20, 1992), we clarified that damages also may be measured by the amount a defendant gained from a breach of a fiduciary duty. *Id.* at 802 & n.1; *see also Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 826 N.W.2d 816, 831-32 (Minn. App. 2013) (affirming award of monetary damages on claim of breach of fiduciary duty), *rev'd on other grounds*, 844 N.W.2d 210 (Minn. 2014).

▮ In ruling against appellants, the district court relied on this court's opinion in *R.E.R. v. J.G.*, 552 N.W.2d 27 (Minn. App. 1996). The *R.E.R.* opinion is not concerned with the rights of minority shareholders in a corporation; rather, the opinion arose from an extramarital affair between a minister and a woman who was a member of the minister's congregation. *Id.* at 28. The woman's husband sued the minister for breach of fiduciary duty and intentional infliction of emotional distress, among other claims. *Id.* This

court held that the plaintiff could not recover damages on his claims because such an award would circumvent the legislature's enactment of a statute abrogating the caselaw concerning heart-balm actions. *Id.* at 29 (citing 1978 Minn. Laws ch. 515, § 2, at 141, codified at Minn. Stat. §§ 553.01-.02 (1994)). We reasoned in the alternative that, even if an award of damages was not foreclosed by statute, the plaintiff nonetheless could not obtain an award of damages for a breach of fiduciary duty as compensation for emotional distress, as opposed to "the lost value of an asset, the profit of which a [plaintiff] was deprived, or any improper financial gains." *Id.* at 30. The *R.E.R.* opinion is inapplicable in the context of this case. It also appears that the district court assumed that a legal remedy may be awarded only on a legal cause of action and that an equitable remedy may be awarded only on an equitable cause of action. But the supreme court has stated that the nature and character of a cause of action does not necessarily correlate with the nature and character of the potential remedies. *See Olson v. Synergistic Technologies Sys., Inc.*, 628 N.W.2d 142, 149, 153 (Minn. 2001); *see also Storms v. Schneider*, 802 N.W.2d 824, 831 (Minn. App. 2011) (discussing confusion concerning nature of theories of relief and nature of remedies), *review denied* (Minn. Oct. 26, 2011). Thus the district court erred by ruling, as a matter of law, that monetary damages are not available to appellants on a claim of breach of fiduciary duty.[1]

The district court also ruled that, even if monetary damages were available on a claim of breach of fiduciary duty, appellants are not entitled to monetary damages in this particular case because they do not have evidence of a compensable injury. The district court's *sua sponte* consideration of this issue was inappropriate and prejudicial to appellants because respondents did not challenge the sufficiency of appellants' evidence of a breach or appellants' evidence of a financial injury. Respondents' motions were confined to legal issues concerning whether counts 1 through 3 of appellants' complaint pleaded direct claims or derivative claims. Appellants had no reason to submit evidence or arguments concerning their entitlement to a remedy on their claim of breach of fiduciary duty. Thus, the district court erred by concluding that appellants do not have evidence to support an award of monetary damages on count 1.

Therefore, the district court erred by granting respondents' motions for summary judgment on count 1.

## II.

Appellants argue that the district court erred by granting summary judgment to respondents on count 2, the claim arising under Minnesota Statutes section 302A.751, subdivision 1(b)(3). Appellants contend that there are genuine issues of material fact as to whether respondents acted in an unfairly prejudicial manner toward them.

## A.

The Minnesota Business Corporation Act confers certain rights and potential remedies on minority shareholders of corporations. The particular provision on which appellants rely states as follows:

---

1. In light of this conclusion, and in light of our conclusion in part II, we need not resolve appellants' contention that the district court erred by ruling that they are seeking monetary damages but not seeking equitable relief in count 1. Appellants plainly are seeking equitable relief in count 2, and the legal basis of count 2 incorporates the common-law fiduciary duty. *See* Minn. Stat. § 302A.751, subd. 3a (2016).

A court may grant any equitable relief it deems just and reasonable in the circumstances or may dissolve a corporation and liquidate its assets and business:

. . . .

(b) In an action by a shareholder when it is established that:

. . . .

(3) the directors or those in control of the corporation have acted in a manner unfairly prejudicial toward one or more shareholders in their capacities as shareholders or directors of a corporation that is not a publicly held corporation, or as officers or employees of a closely held corporation.

Minn. Stat. § 302A.751, subd. 1.

The term "unfairly prejudicial," as used in this statute, is not defined within the statute. But the supreme court has interpreted the term to include "conduct that frustrates the reasonable expectations of shareholders in their capacity as shareholders." *U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 377, 379 & n.10 (Minn. 2011) (quoting *Berreman v. West Publishing Co.*, 615 N.W.2d 362, 374 (Minn. App. 2000), *review denied* (Minn. Sept. 26, 2000)). The concept of "reasonable expectations" also appears in another subdivision of the same statute:

In determining whether to order equitable relief, dissolution, or a buy-out, the court shall take into consideration [1] the duty which all shareholders in a closely held corporation owe one another to act in an honest, fair, and reasonable manner in the operation of the corporation and [2] the reasonable expectations of all shareholders as they exist at the inception and develop during the course of the shareholders' relationship with the corporation and with each other.

Minn. Stat. § 302A.751, subd. 3a.

▪ As the structure of subdivision 3a indicates, the rights and remedies provided by section 302A.751 may be based on two sources. First, a district court may refer to the pre-existing common-law duties owed to a minority shareholder. Second, a district court may refer to the "reasonable expectations" of the shareholders of a particular corporation. If there are "any written agreements ... between or among shareholders or between or among one or more shareholders and the corporation," such agreements "are presumed to reflect the parties' reasonable expectations concerning matters dealt with in the agreements." *Id.* Even if there are no such agreements, a district court may consider evidence of "a course of dealing that implies an agreement" and "understandings that would normally be expected to result from associative bargaining." *Gunderson*, 628 N.W.2d at 185 (quotation omitted); *see also Pedro II*, 489 N.W.2d at 802-03.

▪ Whether a shareholder's conduct complies with his or her common-law fiduciary duties generally is a question of fact. *Pedro II*, 489 N.W.2d at 801-02. Similarly, whether a shareholder's conduct complies with the reasonable expectations of all shareholders generally is a question of fact, *Gunderson*, 628 N.W.2d at 186, and a district court must consider the "unique facts" of each case when determining shareholders' reasonable expectations, *Pedro II*, 489 N.W.2d at 802-03. A district court should grant summary judgment to a defendant on a claim arising under section 302A.751 only if no rational factfinder could find that a defendant shareholder breached a common-law fiduciary duty to a plaintiff shareholder or acted contrary to the reasonable expectations of all shareholders. *Gunderson*, 628 N.W.2d at 186.

▪ If a minority shareholder has established a violation of the rights protected by the statute, a district court may "grant

any equitable relief it deems just and reasonable in the circumstances." Minn. Stat. § 302A.751, subd. 1. A district court has authority to "grant a broad range of equitable remedies," *Berreman*, 615 N.W.2d at 369, and that remedial authority "is meant to be used," *PJ Acquisition Corp. v. Skoglund*, 453 N.W.2d 1, 18 (Minn. 1990) (Yetka, J., on behalf of majority). "The broad scope of Section 751 reflects the Legislature's trust in the ability of the judiciary to achieve equitable results on the facts appearing in individual cases." *Pedro I*, 463 N.W.2d at 289 (quotation omitted).

## B.

In this case, appellants' claim under section 302A.751, subdivision 1(b)(3), is based on both prongs of subdivision 3a. With respect to the first prong of subdivision 3a, appellants argue that respondents acted in an unfairly prejudicial manner by breaching their fiduciary duties to appellants. Appellants presented that argument to the district court, but the district court did not expressly address it. To the extent that appellants' claim in count 2 overlaps with their claim in count 1, and to the extent that we have concluded that appellants' claim in count 1 survives respondents' motions for summary judgment, *see supra* part I, the district court erred by granting summary judgment to respondents on count 2.

Appellants' primary argument, which is based on the second prong of subdivision 3a, is that respondents acted in an unfairly prejudicial manner by acting contrary to the reasonable expectations of all shareholders. The district court resolved this part of appellants' claim by reasoning that "WFI was created as an advantageous method of transferring ownership of ... Richard Ward's real estate to his children," that appellants "knowingly participated in the plan by quit-claiming

their legal interest in the property to the corporation," and that appellants' "expectation that their ownership interest in WFI also entitled [them] to participate in the management and operation of ERMI was clearly unreasonable." The district court also reasoned that appellants were aware that "Richard Ward intended to secure ERMI's long-term future on the property before eventually transferring his interest" in WFI. The district court concluded that appellants' reasonable-expectations claim fails as a matter of law.

The district court omitted from its analysis any mention of Richard and Rosemary's dissolution decree. The omission is explained by the district court's earlier, August 2014 order. In the earlier order, the district court stated that Richard and Rosemary's dissolution decree "cannot serve as the basis for Plaintiffs' reasonable expectations" because it "became unenforceable prior to the formation of WFI, never bestowed any property rights in the first place, and does not even qualify as a written agreement under Section 302A.751, subd. 3a." Appellants contend that the district court erred in this part of its analysis.

We first consider the district court's statement that the dissolution decree "does not even qualify as" an agreement between or among shareholders. The district court's reasoning refers to the statutory provision that an agreement "between or among shareholders or between or among one or more shareholders and the corporation" is "presumed to reflect the parties' reasonable expectations concerning matters dealt with in the agreements." *See* Minn. Stat. § 302A.751, subd. 3a. It is true that Richard and Rosemary's dissolution decree is not such an agreement. As a consequence, there is no presumption that the dissolution decree reflects the parties' reasonable expectations. *See id.* But the absence of a presumption

does not preclude appellants from attempting to prove that the dissolution decree created reasonable expectations that were shared by all parties. The statute does not state that shareholders have no reasonable expectations if there are no agreements between or among shareholders. *See id.* Our caselaw demonstrates that shareholders' reasonable expectations may "arise from understandings that are not expressly stated in the corporation's documents," *Gunderson*, 628 N.W.2d at 186, such as implicit agreements based on family history and a course of dealing, *Pedro II*, 489 N.W.2d at 803. To the extent that the district court disregarded the dissolution decree on the ground that it is not an agreement between or among shareholders, the district court's reasoning is flawed.

We next consider the district court's statement that the dissolution decree is unenforceable because it pre-dates the formation of WFI. We are unaware of any caselaw stating that a common understanding that arose before the formation of a corporation may not be a source of shareholders' reasonable expectations. We see no logical reason why a common understanding that arose before the formation of a corporation could not inform or explain the actions of shareholders throughout the existence of the corporation. To the extent that the district court disregarded the dissolution decree because it pre-dates the formation of WFI, the district court's reasoning also is flawed.

We next consider the district court's statement that the dissolution decree "never bestowed any property rights" on appellants. This statement is in conflict with the evidence that each of the seven children was asked to execute a quit-claim deed as a means of effectuating one of the purposes of the dissolution decree. The perceived need for a quit-claim deed indicates that appellants had some form of rights to the property. In any event, the pertinent question is not whether the dissolution decree conferred property rights on appellants but whether the dissolution decree caused appellants to develop reasonable expectations of property rights. The dissolution decree speaks directly to that issue because it contains provisions that, among other things, required Richard to keep the 1,200-acre property in his own estate, required him to execute a will that would bequeath the 1,200-acre property to his seven children upon his death, gave Richard's seven children "sole discretion as to whether said real estate should be sold in the future," and gave Richard's seven children a right of first refusal in the event that the property was placed on the market. In light of the express terms of the dissolution decree, the district court incorrectly reasoned that the dissolution decree could not give rise to reasonable expectations regarding rights in the 1,200-acre property.

Respondents attempt to justify the district court's order by contending that the dissolution decree is irrelevant because it relates only to ERMI but does not relate to the 1,200-acre property that is owned by WFI. Respondents are incorrect. One paragraph of the dissolution decree governs the real property, and one paragraph governs ERMI. Paragraph 3, which is nearly three pages long, begins by stating that Richard "shall assume ownership and title to certain real estate, commonly referred to as El Rancho Manana Campgrounds and Riding Stable which is legally described as...." Each of the six subparagraphs that follow refers to "the above-described real estate," "said property," or the like. Five of those sub-paragraphs require Richard to take, or prevent him from taking, certain actions with respect to the property. A separate paragraph, paragraph 4, concerns "stock in the Minnesota Corporation El Rancho Mana-

na, Incorporated" and requires Richard to ensure that he "and the seven natural children of [Richard and Rosemary] shall have direct, decision making authority relating to the conduct of the business, expansion and/or improvements." Again, all appellants were asked to execute a quitclaim deed with respect to the 1,200-acre property as a means of effectuating one of the purposes of the dissolution decree. The district court's decision cannot be justified on the ground that the dissolution decree relates only to ERMI and does not relate to the 1,200-acre property that now is owned by WFI.

In discussing the issue of reasonable expectations, the district court alluded to "other promises," including promises made to the seven children when they quitclaimed their interests in the 1,200-acre property to WFI. But the district court did not determine whether those promises gave rise to reasonable expectations. Appellants continue to contend that those promises are a basis of their reasonable expectations. Their argument is based in part on the December 25, 2012 meeting between WFI's attorney and the seven children. Charles testified that WFI's attorney said that executing the quit-claim deed "doesn't change anything; everything else is still the way it was; it's just a vehicle to help Richard with his estate planning to transfer the property to the children." This court has stated that shareholders' reasonable expectations may be based on "a course of dealing that implies an agreement" as well as "the understandings that would normally be expected to result from associative bargaining," includ-

ing "the understandings objectively reasonable close-corporation shareholders would have reached if, at the venture's inception, they had bargained over how their investments should be protected." *Gunderson*, 628 N.W.2d at 185 (quotation omitted). To the extent that the district court did not consider the promises made when appellants quit-claimed their interests in the 1,200-acre property, the district court's reasoning also is flawed.

For all these reasons, the district court erred in its analysis of appellants' claim based on the shareholders' reasonable expectations. Therefore, the district court erred by granting respondents' motion for summary judgment on count 2.[2]

## III.

Thomas argues that the district court erred by granting summary judgment to respondents on counts 4 through 7, appellants' derivative claims on behalf of WFI against respondents.

 If a shareholder has alleged a derivative claim, the board of directors of a corporation may, by resolution, form a "special litigation committee consisting of one or more ... independent persons to consider legal rights or remedies of the corporation and whether those rights and remedies should be pursued." Minn. Stat. § 302A.241, subd. 1 (2016). A court must defer to an SLC's decision under the business-judgment rule. *In re UnitedHealth Grp.*, 754 N.W.2d at 555. An SLC satisfies the requirements of the business-judgment rule, and thus is deserving of deference, if the SLC was independent and conducted

---

2. Kathryn and Charles also argue that the district court erred by granting respondents' motions for summary judgment on count 3, in which appellants seek to recover their costs of litigation on their direct claims. Respondents do not respond to the argument. It appears that the district court concluded that the

claim in count 3 is without merit because the claims in counts 1 and 2 are without merit. Thus, we agree with Kathryn and Charles that, in light of our conclusions concerning counts 1 and 2, the district court's entry of summary judgment on count 3 also should be reversed.

its investigation in good faith. *Id.* at 559. The corporation bears the burden of establishing both of these requirements. *Id.* at 561. In determining whether a district court properly deferred to an SLC, an appellate court may not make "any inquiry into 'which factors were considered by [the SLC] or the relative weight accorded them in reaching [its] substantive decision.' " *Id.* at 555 (first alteration in original) (quoting *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994, 1002 (1979)). Rather, an appellate court may consider only " 'the appropriateness and sufficiency of the investigative procedures chosen and pursued by the committee.' " *Id.* (quoting *Auerbach*, 419 N.Y.S.2d 920, 393 N.E.2d at 996).

In the district court, respondents moved for summary judgment on counts 4 through 7 on the ground that the district court should defer to the SLC's recommendations that WFI not pursue appellants' derivative claims against respondents. Appellants urged the district court to deny the motion on the ground that the SLC did not conduct its investigation in good faith. The district court reasoned that the SLC's recommendation was "professional, thorough and unassailable" because the attorney who constituted the SLC is experienced and reputable, because the SLC's investigation took place over a period of five months and involved "voluminous documentation" and numerous interviews, and because the SLC's report was "clear, organized and well-reasoned."

On appeal, Thomas asserts four reasons why the SLC did not conduct its investigation in good faith: (1) the SLC did not use an expert during its investigation and did not mention in its report the opinion of a real-estate attorney; (2) the SLC allowed WFI's attorney to interfere with the investigation and engage in improper communication with the SLC; (3) the SLC inter-

viewed the individual defendants jointly; and (4) the SLC did not obtain any documents from Richard or Kevin.

 Thomas's four challenges are not supported by caselaw or the evidentiary record. First, we are unaware of any authority for the proposition that an SLC's investigation is not in good faith merely because the SLC did not rely on an expert. Rather, reliance on experts is just one of several factors in the good-faith analysis. *See Drilling v. Berman*, 589 N.W.2d 503, 509 (Minn. App. 1999), *review denied* (Minn. May 18, 1999). In this case, the SLC's report states that it considered an expert report that was received from appellants concerning an appraisal of the 1,200-acre property and the consequences of the written lease agreement. The report also states that the SLC consulted with a real-estate attorney on issues related to the lease. The SLC report states that it "determined that no other experts were needed for its investigation and analysis of the issues." That determination does not indicate a lack of good faith.

 Second, the SLC's report states that it "interviewed the parties' various professionals familiar with the operations of WFI and ERMI, and the ongoing disputes between the shareholders" and that "[t]he undersigned and counsel actively participated in all interviews." It appears that written communications between the SLC and WFI's attorney were limited to facilitating the SLC's review of corporate documents, clarifying the terms of Kevin's purchase of ERMI, and facilitating WFI's payment for the SLC's services. The SLC also engaged in communications with Kevin's attorney when negotiating the settlement agreement and lease addendum. It does not appear that WFI's attorney or Kevin's attorney exerted any undue influence on the SLC. Thomas has not demonstrated that the SLC's communications

with WFI's attorney demonstrates a lack of good faith.

Third, Thomas offers no authority for the proposition that an SLC may not conduct joint interviews of individual defendants. Likewise, he offers no evidence that the joint interviews compromised the SLC's investigation in this case.

■ Fourth, Thomas does not identify the documents or types of documents that the SLC should have obtained from Richard. At the time of the SLC's investigation, Richard no longer was a director or the majority shareholder of WFI and no longer was a shareholder or officer of ERMI. Molly and Ann, the two officers of WFI, produced more than 3,000 documents to the SLC on behalf of WFI. Kevin produced "certain information, including financial information" about ERMI, which was made available to the SLC on a confidential basis. The SLC stated in its report that it "repeatedly asked all parties and their counsel to identify additional witnesses to interview, and documents and other information to review, and other helpful actions" and that it concluded that "it has been permitted access to those persons it has deemed necessary to interview and that it was provided thorough and accurate documents as requested." The documents on which the SLC relied are recorded in a 35-page log.

On the whole, the record shows that the SLC engaged in a good-faith investigation. The SLC's procedures were unlike those in *Janssen*. In that case, the supreme court did not defer to the SLC's recommendation because, among other things, the SLC failed to interview the plaintiff and plaintiff's counsel during its investigation and did not analyze the benefits and detriments of pursuing legal action. 662 N.W.2d at 889. In this case, the SLC's procedures were "adequate, appropriate, and pursued in good faith." *See UnitedHealth Grp.*, 754

N.W.2d at 559. Accordingly, we defer to the SLC's recommendation that WFI not pursue derivative claims against respondents.

Therefore, the district court did not err by granting summary judgment to respondents on counts 4 through 7.

## DECISION

The district court erred by granting summary judgment to respondents on counts 1, 2, and 3. The district court did not err by granting summary judgment to respondents on counts 4 through 7. We affirm in part, reverse in part, and remand for further proceedings.

**Affirmed in part, reversed in part, and remanded.**